# Wytheville

MASSAPONAX SAND AND GRAVEL COPORATION, A CORPORATION
v. VIRGINIA ELECTRIC AND POWER COMPANY, A CORPORATION.

June 11, 1936.

Present, Holt, Hudgins, Gregory, Chinn and Eggleston, JJ.

The opinion states the case.

*Tucker, Bronson, Satterfield & Mays,* for the plaintiff in error.

*T. Justin Moore* and *Archibald G. Robertson,* for the defendant in error.

HUDGINS, J., delivered the opinion of the court.

The plaintiff in the trial court, Virginia Electric & Power Company, instituted this action to recover $2,681.83, alleged to be due for electric energy sold and delivered to defendant. Defendant plead the general issue, filed a special plea of set-off, and subsequently offered to amend the special plea. On motion of plaintiff the trial court rejected the special and amended pleas, and on proof of the correctness of the account for power supplied, the court, without a jury, entered a judgment for plaintiff in the sum of $2,437.70.

The only assignment of error is to the ruling of the trial court in rejecting the special pleas. In considering this question, all facts properly alleged and set forth in the pleas are assumed to be true.

The pleas allege that sometime in 1926 plaintiff extended its power line into the Fredericksburg area, and began supplying 60-cycle electric current to defendant and other consumers of the electric energy in that area. The current formerly supplied to defendant and others, was a 25-cycle current; thus it became necessary either to install new motors at defendant's plant, or to rewind

the old motors, so that power could be supplied from 60-cycle current. Plaintiff verbally agreed to make the change in defendant's motors, and to do so in such a manner as to avoid any increase to defendant in cost of power supplied.

Plaintiff performed this agreement by rewinding all defendant's motors. When this was done, it was found that the rewound motors consumed much more current than formerly, but plaintiff charged defendant only the monthly sum it had previously paid for power consumed when the 25-cycle current was used.

About this time, but unknown to defendant, on applicacation of plaintiff, the Corporation Commission prescribed a new and higher tariff for power supplied in the Fredericksburg area. Prior to the time the new tariff became effective the charge for power had been based on the electric energy consumed. Under the new tariff there was a provision for both an *energy* charge, and a *demand* charge. The form of contract which plaintiff was authorized by the Commission to execute with the consumers of electric energy, provided that:

"Note:—The 'Demand' and 'Energy' charges included in this schedule are independent of each other, the former covering the demand for which the customer requires the company to provide, the latter covering electrical energy used.

"The demand charges are to cover the company's fixed investment and operating charges in establishing service and standing ready to serve, and do not include the supply of electricity.

"Wholesale Power Service

"Demand Charge:

First 25 K. W. or less, of Demand—$37.50 per month.
Next 25 K. W. of Demand—$1.25 per K. W. per month.
Over 50 K. W. of Demand—$1.00 per K. W. per month.

The above demands shall be taken in accordance with the company's standard method of fixing demands.

"Energy Charge:

In addition to the demand charges above specified a meter rate will be charged for electricity consumed as follows:

First 1,000 K. W. H. Consumed per month—$0.025.
Next 4,000 K. W. H. Consumed per month—$0.02.
Next 10,000 K. W. H. Consumed per month—$0.015.
Next 35,000 K. W. H. Consumed per month—$0.0125.
Excess over 50,000 K. W. H. Consumed per month—$0.01.

"If a minimum demand of 50 K. W. is paid for under a contract for three years the first 10,000 K. W. H. of monthly consumption will be charged for at the rate of .015 per K. W. H., the next 40,000 K. W. H. will be charged for at the rate of 0.125 per K. W. H.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

### "METHOD OF DETERMINING DEMAND

"The demand is the greatest amount of electricity normally used by the customer at any one period of time. It may be estimated or determined by measurement by the company from time to time, according to the customer's use of electricity.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"During the construction period, the demand may be estimated as the minimum demand provided for by the rate applied.

"Where service is started under any contract which provides for a demand charge and an additional meter charge, or for a guaranteed consumption based on the customer's demand, the demand is obtained in the following manner:

"First—By instruments installed to measure the demand:

"(a) When demand measurements are taken, the demand to be used as a basis of charges shall be the maximum thirty (30) minute kilowatt load measured during

the current month. This maximum shall be determined by standard meters, or other suitable instruments.

"(b) The demand, when once established, shall never be less than 25 per cent of the highest demand established during the previous eleven months.

"Second—By Estimate:

"(a) When estimated, the demand shall not be taken as less than the minimum provided for under the standard rate in the contract.

"(b) When estimated, the demand shall not be taken as less than one-half of the installation as defined above.

"(c) The company reserves the right at any time to measure the demand where it has been previously estimated, and when so measured, the service shall be paid for on that basis."

A written contract was executed by the parties under date of August 15, 1926, which contained the above provisions. It is alleged in the plea that under the terms of the written contract plaintiff had the option of making either an "estimated demand charge," or a "measured demand charge." That inasmuch as the "measured demand charge" would very much increase the cost of power supplied, plaintiff verbally agreed to so interpret the written contract to supply power to defendant on "estimated demand charge" of 50 kilowatts per month. The plea then alleged; "4. The contract of the said parties to charge and pay an estimated 50 kilowatt demand was carried out throughout the life of said contract of August 16, 1926, which terminated three years thereafter, and said agreement to charge a 50 kilowatt estimated demand was continued thereafter without the execution of any new written contract, until the end of the year, 1929, at which time defendant leased its plant near Fredericksburg, together with other property, to one John Twohy, who remained in possession as lessee until January, 1933, at which time defendant again took possession of the said properties and resumed the operation of same. During the term of the Twohy lease plaintiff refused to supply

electrical energy on an estimated demand charge, but required a measured demand, contending that its contract for an estimated demand was for the benefit of defendant alone, and not for its tenant. When defendant again took possession of its plant in January, 1933, it insisted upon an estimated demand, in accordance with its agreement with plaintiff. Plaintiff thereupon refused to supply electrical energy except upon the basis of measured demand and insisted that defendant sign a written contract to that effect. Defendant refused to do this, thereupon plaintiff threatened to cut off all power at defendant's plant. Defendant had no source of power except from plaintiff and, had plaintiff cut off the power as threatened, defendant's plant would have been shut down, with disastrous results to defendant's business. Plaintiff then presented defendant with a written contract under date of January 24, 1933, which contained substantially the same terms as the written contract between the parties, dated August 16, 1926. The said contract of January 24, 1933, moreover, did not fix a measured demand charge, but left the choice of measured and estimated demand to plaintiff, as was provided by the contract of 1926. However, as plaintiff had notified defendant of its intention to elect to charge a measured demand, defendant continued to protest its execution and did not execute the contract until plaintiff had threatened to cut off all power from defendant's plant, as above set forth.

The plea further alleged:

"5. The measured demand provided in said contract of January 24, 1933, greatly increased defendant's power costs. Defendant continually protested this increase and conferences were held between representatives of plaintiff and defendant as to the means of alleviating the situation thus occasioned. Under a measured demand, power costs to defendant could be lowered only by the installation of new motors and attached pumps to replace the motors which had been rewound by plaintiff. Plaintiff stated that this change must be made if defendant wished to remedy

the excessive demand charge, but refused itself to make the installation."

There followed a statement that defendant installed new motors at a cost to it of $3,416.02, and the further statement that the difference between the estimated demand charge of 50 kilowatts per month, and the measured demand charge from January 1, 1933, until the date the new motors were installed was $1,913.10, making the total sum of $5,319.12, which defendant alleged plaintiff should pay.

Assuming, but not conceding, that the verbal contract to interpret the written contract of August 15, 1926, providing that defendant should be supplied power at the estimated demand charge of 50 kilowatts per month, was supported by valid consideration, and was binding on the parties, it seems to follow that the verbal agreement terminated when the written contract terminated. The fact that without further negotiation between the parties the same demand charge was continued from August 15, 1929, through December of that year, would not of itself be sufficient to keep the verbal agreement indefinitely alive. It is alleged that the lessee of defendant was supplied power by plaintiff, and that he was charged, and paid the "measured demand charge" for power supplied defendant's plant from January 1, 1930, to December 31, 1932. When the lease expired and defendant resumed operation of its plant, plaintiff refused to supply it power on any basis other than the basis it supplied Twohy, the lessee, and all other consumers similarly situated. Defendant in its brief states: "But estimated demand of 50 kilowatts resulted in a charge to Massaponax which was recognized by both parties as fair. It was fair and necessary immediately after the motors were rewound, continued so until the end of 1929, when Massaponax leased the premises to Twohy, and continued (in so far as Massaponax as a consumer was concerned) after Massaponax took over the operation of its plant in 1933. What was fair in 1926 continued so in 1933 because the rewound

motors were the same and conditions remained precisely the same as before. For the Power Company to abandon estimated demand was to return to the very method of fixing demand which it had theretofore recognized as discriminatory."

This is tantamount to the contention that the Corporation Commission has approved a schedule of rates and charges in which a public service corporation has an option of so construing its provisions that one consumer could be supplied indefinitely with power at much less cost than other consumers under the same classification. Such provisions for the application of rates is contrary to that part of the provisions of Code, section 4066, as amended by Acts 1927, Ex. Sess., ch. 36, reading: "It shall be the duty of every public utility to furnish reasonably adequate service and facilities at reasonable and just rates to any person, firm or corporation along its lines desiring same and not engaged in a similar business, and to charge uniformly therefor all persons or corporations using such products under like conditions, and not in competition with such furnishing company."

No public service corporation had any authority, by express contract, or otherwise, to change or vary the schedule of rates and charges approved by the Corporation Commission, so that power would be supplied one member of the public at a greater or less cost than other members of the public similarly situated. The provisions any contract executed by a public service corporation and its subscribers by which the corporation has the option of so construing the contract as to work a discrimination between members of the public in the same class, is against public policy, and is void. All contracts made between such companies and their subscribers, with the exceptions noted in Code, section 4066, as amended, are subject to change of schedule in rates and charges which may thereafter be ordered by the Corporation Commission. This question was fully discussed in *Commonwealth* v. *Shenandoah R. L. & P. Corp.*, 135 Va. 47, 115 S. E. 695.

Defendant concedes the correctness of this principle, but states its contention thus: "An agreement by the Power Company with petitioner whereby it would furnish petitioner with current at a special rate would not be enforced by the courts. However, the petitioner in this case had no special agreement with the Power Company whereby the latter would supply current at a lower rate than that provided by the tariff. On the contrary this agreement of the parties, which did not relate to *energy* charges at all, but only to the method of determining *demand* charges, is not only not violative of law or public policy, but carries out both the letter and spirit of the tariff, which provides an alternative of fixing demand which is peculiarly and justly applicable under the facts of this case."

■■ The exact method of determining the total cost per month of users of power is not so important. Whatever method is used the result is the determining factor, i. e., the total charges made by the company for power supplied must be uniform to all similarly situated, and a provision in any contract which permits the company to construe it so that a preferential discrimination may be made, is equally violative of the section quoted. If the schedule of rates and charges are, because of the peculiar situation of defendants, unjust or unreasonable, defendant has a right to make application to the Corporation Commission for it to fix a different and lower schedule of rates and charges which may be just and reasonable. Code, section 4071. *City of Clifton Forge* v. *Virginia-Western Power Co.,* 129 Va. 377, 106 S. E. 400.

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*