## MCI TELECOMMUNICATIONS CORPORATION, Plaintiff,

v.

## GRAPHNET, INC., Defendant.

### Civ. A. No. 94–4168 (DRD).

United States District Court,
D. New Jersey.

March 31, 1995.

---

Cynthia Richardson, Porzio, Bromberg & Newman, Morristown, NJ, for plaintiff.

Alan A. D'Ambrosio, Schnader, Harrison, Segal & Lewis, New York City, for defendant.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiff MCI Telecommunications Corporation ("MCIT") moves to dismiss counterclaims raised by defendant Graphnet, Inc. ("Graphnet"). For the reasons which follow, the motion will be granted in part and denied in part.

## BACKGROUND

Graphnet is a licensed telecommunications carrier providing services including domestic and international telex transmission, specialized messaging, electronic mail, data communications and facilities management. MCIT is a licensed telecommunications carrier providing domestic and international voice transmission services. MCIT is a wholly-owned subsidiary of MCI Communications Corporation ("MCI").

MCIT instituted this action against Graphnet in an attempt to recover approximately $720,000.00 for voice transmission services provided to Graphnet. Graphnet filed a counterclaim against MCIT alleging antitrust and contract claims.

Graphnet's antitrust claims implicate the relationship between MCIT and another wholly-owned subsidiary of MCI, MCI International, Inc. ("MCII"). MCII is a direct competitor of Graphnet in the domestic and international markets for telex and facsimile transmission services. MCII and Graphnet were both customers of MCIT, which provided them with voice transmission services.

Graphnet alleges that MCIT aided MCII in its efforts to monopolize the domestic and international telex and facsimile markets and drive Graphnet out of business. Graphnet alleges that MCIT aided, abetted and participated in MCII's efforts by withdrawing certain discounts previously given to Graphnet for voice transmission services, and by charging lower rates to MCII than Graphnet in an effort to harm Graphnet while subsidizing MCII's alleged predatory pricing practices. Graphnet alleges that those acts constitute a violation of § 2 of the Sherman Act, 15 U.S.C. § 2. It also alleges contract actions for fraud in the inducement and breach of contract.

## STANDARD FOR A MOTION TO DISMISS

Pursuant to Rule 12(b)(6), a claim embodied in a complaint or counterclaim must be dismissed for failure to state a claim if the opposing party demonstrates "beyond a doubt that [the claimant] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 634 (3d Cir.1989); *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980). All allegations set forth in the claim must be accepted as true, *see Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972), and all reasonable inferences must be drawn in the claimant's favor. *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). On a 12(b)(6) motion, the district court is limited to the facts alleged in

the complaint or counterclaim, not those raised for the first time by counsel in its legal memorandum. *Hauptmann v. Wilentz,* 570 F.Supp. 351, 364 (D.N.J.1983), *aff'd without opinion,* 770 F.2d 1070 (3d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Seevers v. Arkenberg,* 726 F.Supp. 1159, 1165 (S.D.Ind.1989) ("This court is not at liberty, however, to consider allegations which do not appear in the complaint, but which are averred only in legal briefs.").

The Third Circuit, however, has held that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgment, "if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

### ANALYSIS

MCIT argues that Graphnet's antitrust allegations cannot state a claim under current legal standards, and that its contract claims are preempted under the Communications Act or precluded by the associated filed rate doctrine.

#### 1. The Antitrust Count

■ As its first point, MCIT argues that there is no explicit or implied cause of action under the Sherman Act for aiding and abetting a violation of the statute. The crux of the parties' disagreement over this issue derives from differing interpretations of the United States Supreme Court's recent decision in *Central Bank of Denver v. First Interstate Bank of Denver,* —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

In *Central Bank,* the Court noted that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* at ——-——, 114 S.Ct. at 1450–51 (citing *Electronic Laboratory Supply Co. v. Cul-*

*len,* 977 F.2d 798, 805–806 (3d Cir.1992)). The Court pointed out that Congress has taken a "statute-by-statute approach to civil aiding and abetting liability" and has included specific provisions imposing such liability in many statutes including the Internal Revenue Code, Commodity Exchange Act, National Bank Act and others. *Id.* —— U.S. at ——, 114 S.Ct. at 1451.

■ Graphnet responds that because *Central Bank's* holding related to § 10(b) of the Securities Exchange Act of 1934 ("SEA"), its reasoning cannot be applied to a question arising under the Sherman Act. However, the Court's analysis with regard to the general question of implied aiding and abetting liability was not limited merely to the provisions of the SEA. Even if reasoning employed by the Supreme Court is broader than the scope of its specific holding and therefore constitutes dicta, courts "consider and respect Supreme Court dicta as well as holdings because the Supreme Court hears relatively few cases and frequently uses dicta to give guidance to the lower courts." *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp.,* 959 F.2d 468, 496 & n. 41 (3d Cir.1992) (en banc).

■ Because the Sherman Act is a statute providing for civil damages for violative conduct, and fails to explicitly provide for aiding and abetting liability, none will be presumed unless there is sufficient evidence of congressional intent to the contrary. Rather than providing evidence of such congressional intent, however, Graphnet merely relies on the wording of § 2, which provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

15 U.S.C. § 2. Graphnet argues that the Supreme Court has recognized the "breadth of the statute [and] refused to superimpose specific pleading requirements on the words of the statute...." (Def.'s Opp'n Br. at 9.) In support of that contention, it quotes *Eastman Kodak Co. v. Image Technical Services,*

*Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992):

> Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. [The Supreme] Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record."

*Id.* at 467, 112 S.Ct. at 2082. That statement does little to advance Graphnet's argument, however, because broad reading of a statute and relaxed pleading requirements cannot by themselves create an aiding and abetting cause of action in the absence of congressional intent. Rather, the fundamental question is whether the conduct complained of can be construed as that which the statute forbids.

Therefore, to the extent Graphnet's counterclaim asserts that MCIT aided and abetted MCII in MCII's monopolistic conduct, it fails to state a viable cause of action against MCIT. In order to state a valid antitrust claim against MCIT, the counterclaim must assert conduct by MCIT that is directly forbidden by the Sherman Act.

To that extent, Graphnet's antitrust allegations generally suffer from the fact that it is a customer, rather than a competitor, of MCIT. In fact, virtually all the allegations of monopolistic conduct in its counterclaim refer to conduct by MCII, some of which MCIT is alleged to have "participated" in. When examined in detail, however, that "participation" turns out to be conduct which constitutes aiding and abetting.

For example, paragraph 25 of the Counterclaim alleges that MCII is able to engage in predatory pricing because "its affiliate, MCIT, subsidizes MCII's unprofitable data communications services through profitable voice and leased line operations...." In other words, MCII is alleged to be engaging in the prohibited conduct of predatory pricing; MCIT is merely alleged to help make it financially possible for MCII to do so. MCIT is therefore merely aiding MCII in its violative conduct. MCIT cannot be said to be engaging directly in predatory pricing because, based on Graphnet's own allegations, it doesn't even compete against Graphnet. It should be noted that Graphnet has already instituted an antitrust action against MCII in this Court alleging an attempt to monopolize the telex market. *Graphnet, Inc. v. MCI International, Inc.,* Civ. No. 93–2046 (DRD) (D.N.J. filed May 14, 1993).

Graphnet is unable to cite any case law which supports its contention that aiding and abetting exists as an independent theory of liability under the Sherman Act. Rather, to the extent the phrase "aiding and abetting" appears in the context of cases under the Sherman Act, it is only as a means of describing involvement in a conspiracy in violation of the Act. *See, e.g., U.S. v. MMR Corp.,* 954 F.2d 1040, 1042 (5th Cir.1992) (describing indictments for "joining and aiding and abetting a conspiracy in violation of Section 1 of the Sherman Act....").

However, the Supreme Court has recognized limitations on the extent to which conspiracy can be alleged against related corporate entities whose interests are ultimately singular. That limitation was recognized by the Supreme Court in the context of § 1 of the Sherman Act's prohibition of unreasonable restraints of trade effectuated by "contract, combination ... or conspiracy...." 15 U.S.C. § 1; *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld,* the Court held that a corporation and its wholly-owned subsidiary were legally incapable of conspiring in violation of § 1. *Copperweld,* 467 U.S. at 771, 104 S.Ct. at 2741–42.

The limitation has also been recognized as extending to alleged conspiracies between wholly-owned subsidiaries of a parent corporation. *See, e.g., Advanced Health–Care Serv. v. Radford Com. Hosp.,* 910 F.2d 139, 146 (4th Cir.1990) ("[W]e conclude that two subsidiaries wholly owned by a parent corporation are legally incapable of conspiring with one another for purposes of § 1 of the Sherman Act."); *Directory Sales Management Corp. v. Ohio Bell Telephone Co.,* 833 F.2d 606, 611 (6th Cir.1987) ("We agree ... that *Copperweld* precludes a finding that two wholly-owned sibling corporations can combine for purposes of section 1."); *Century Oil*

*Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316, 1317 (5th Cir.1984); *Hood v. Tenneco Texas Life Ins. Co.,* 739 F.2d 1012, 1015 (5th Cir.1984); *Cohen v. Primerica Corp.,* 709 F.Supp. 63 (S.D.N.Y.1989); *Satellite Financial Planning Corp. v. First Nat. Bank of Wilmington,* 643 F.Supp. 449 (D.Del.1986).

Courts have also applied the logical limitation on intraenterprise conspiracy and combination under § 1 of the Sherman Act to conspiracy claims under § 2. *See Valet Apartment Services, Inc. v. Atlanta Journal and Constitution,* 865 F.Supp. 828, 833–34 (N.D.Ga.1994) ("The *Copperweld* principle applies also to § 2 conspiracy claims.") (citing *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 839 (S.D.N.Y. 1988)); *Vollrath v. Sammi Corp.,* No. CV 85–820 MRP, 1989 WL 201632, at *15 (C.D.Cal. 1989) ("The *Copperweld* rule should be equally applicable to an allegation of conspiracy under section 2.") (citing *H.R.M., Inc. v. Tele–Communications, Inc.,* 653 F.Supp. 645, 648 (D.Colo.1987)); *See also, City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op.,* 838 F.2d 268, 270, 274–77 (8th Cir.1988).

Graphnet's efforts to allege antitrust aiding and abetting against MCIT seem, therefore, to be primarily an attempt to circumvent the limitation on intraenterprise conspiracy claims. Because the counterclaim fails to allege conduct violative of § 2 of the Sherman Act on the part of MCIT, the antitrust count of the counterclaim will be dismissed.

### 2. The Contract Counts

Counts II and III of Graphnet's counterclaim allege fraud in the inducement and breach of contract, respectively. In response, MCIT argues that those causes of action are preempted by the Federal Communications Act, 47 U.S.C. § 151, *et seq.,* or precluded by the filed rate doctrine.

The Communications Act was implemented to regulate "all interstate . . . communication by wire or radio and . . . all persons engaged within the United States in such communication." 47 U.S.C. § 152(a). Furthermore, it requires that a telephone carrier's "charges, practices, classifications, and regulations for and in connection with [its] communications,

shall be just and reasonable." *Id.* § 201(b). Additionally, a carrier may file tariffs under the Communications Act which describe charges and practices, classifications and regulations. *Id.* § 203. The content of the tariffs is subject to FCC regulation. *Id.*

As a result of the broad provisions of the Communications Act, courts have held that state causes of action based on regulated activities are preempted.

> Questions concerning the duties, charges, and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and . . . the states are precluded from acting in this area. Where neither the Communications Act itself nor the tariffs filed pursuant to the Act deals with a particular question, the courts are to apply a uniform rule of federal common law.

*Ivy Broadcasting Co. v. American Tel. & Tel. Co.,* 391 F.2d 486, 491 (2d Cir.1968). Several courts have recognized, however, that state causes of action may be asserted in the interstate communications context as long as they are distinguishable from those created under the Communications Act. *Cooperative Communications, Inc. v. AT & T Corp.,* 867 F.Supp. 1511, 1516 (D.Utah 1994) (citations omitted). That determination has been based on the savings clause of the Communications Act, which provides:

> Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.

47 U.S.C. § 414. "[S]tate law remedies which do not interfere with the Federal government's authority over interstate telephone charges or services, and which do not otherwise conflict with an express provision of the Act, are preserved by section 414." *Cooperative Communications,* 867 F.Supp. at 1516 (quoting *Kellerman v. MCI Telecommunications Corp.,* 112 Ill.2d 428, 98 Ill.Dec. 24, 30, 493 N.E.2d 1045, 1051, *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986)).

Where a cause of action arises in direct relation to the provision of interstate

communications services, however, it is clear that the Communications Act governs. *See Cooperative Communications*, 867 F.Supp. at 1517; *Nordlicht v. New York Telephone Co.*, 799 F.2d 859 (2d Cir.1986), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 929, 93 L.Ed.2d 981 (1987); *Ivy Broadcasting, supra*. As such, and as Graphnet properly asserts, its claims for fraudulent inducement and breach of contract arise under the Communications Act as a matter of federal common law. (Def.'s Opp'n Br. at 19.)

■ The next stage in the analysis relates to MCIT's assertion that Graphnet's claims are precluded by the filed rate doctrine, sometimes referred to as the filed tariff doctrine. The doctrine has been applied across a spectrum of regulated industries, and prohibits service providers from charging rates other than those set forth in a tariff filed with the regulatory agency. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981) (natural gas industry); *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915) (railroads); *Massaponax Sand & Gravel Corp. v. Virginia Elec. & Power Co.*, 166 Va. 405, 186 S.E. 3 (1936) (electric utilities). Furthermore, customers are charged with knowledge of the tariff rates and cannot enforce agreements for rates other than those provided in the tariff.

Under the Communications Act, the doctrine is embodied in 47 U.S.C. § 203, which requires that common carriers file with the Federal Communications Commission ("FCC") schedules of their charges, as well as regulations, classifications, and practices affecting such charges. 47 U.S.C. § 203(a). Courts have held that, under the filed rate doctrine, "tariffs validly filed in accordance with 47 U.S.C. § 203 operate to conclusively and exclusively control the rights and liabilities between the parties." *AT & T v. Florida–Texas Frgt., Inc.*, 357 F.Supp. 977, 979 (D.C.Fla.1973), *aff'd*, 485 F.2d 1390 (5th Cir. 1973), (citing *Schaafs v. Western Union Telegraph Co.*, 215 F.Supp. 419 (E.D.Wis.1963); *Komatz Construction Inc. v. Western Union Telegraph Co.*, 290 Minn. 129, 186 N.W.2d

691 (1971), *cert. denied*, 404 U.S. 856, 92 S.Ct. 102, 30 L.Ed.2d 98 (1971)).

■ The filed rate doctrine therefore precludes causes of action based on a claim that a party has a right to pay other than the tariff rate. "The general case law is that a regulated carrier must charge the tariff rate established with the appropriate regulatory agency, even if it has quoted or charged a lower rate to its customer." *Marco Supply Co. v. AT & T Communications, Inc.*, 875 F.2d 434, 436 (4th Cir.1989). Furthermore, "the aggrieved customer cannot assert that the carrier is estopped to charge the actual tariff rate because customers are presumed to know what the applicable tariff is." *Id.*

The Supreme Court has recognized, however, that the filed rate doctrine does not preclude all defenses or counterclaims relating to charges made pursuant to a tariff.

> The filed rate doctrine embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate.... It assuredly does not preclude avoidance of the tariff rate, however, through claims and defenses that are specifically accorded by the [Interstate Commerce Act] itself.... [such as the] requirement ... that a carrier's rates be "reasonable."

*Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1219, 122 L.Ed.2d 604 (1993) (citations omitted).

Therefore, to determine whether Graphnet's contract claims are precluded by the filed rate doctrine, it must first be determined whether they embody disagreement with rates or procedures embodied in a filed tariff, and if so, whether the claims are authorized under the Communications Act.

A review of Graphnet's counterclaim reveals the following factual allegations which could be construed as relating to the contract claims, in which MCIT is alleged to have:

1. fraudulently induced Graphnet to enter into a contract for facsimile routing services at a thirty percent discount over tariff rates, which discount was later withdrawn, (Countercl. ¶ 26(b));

2. insisted that Graphnet enter into an exclusive agreement for facsimile services or suffer higher rates, (*Id.* ¶ 26(c));

3. breached an agreement whereby amounts owing to MCIT would be offset by amounts due from MCII to Graphnet for services rendered, (*Id.* ¶ 26(d));

4. deliberately and chronically withheld credits for traffic-minute and call-count discrepancies properly due to Graphnet under its agreement with MCIT, (*Id.* ¶ 26(e)).

Based on those allegations, Count II of the Counterclaim claims that MCIT fraudulently induced "Graphnet to enter into the agreement with MCIT regarding prices for services with the intent to breach said agreement...." (*Id.* ¶ 34.) Count III of the Counterclaim simply alleges that MCIT breached the foregoing contract. (*Id.* ¶ 36.)

Paragraphs 26(b) and 26(c) raise allegations that directly implicate the rates to which Graphnet claims it was entitled. They do not allege, however, that Graphnet was charged more than the tariff rate or that the tariff rate was unreasonable or otherwise in violation of the Communications Act. Counts II and III of the counterclaim will therefore be dismissed under the filed rate doctrine to the extent that they allege causes of actions based on a contractual right to pay rates other than the tariff rate.

Paragraph 26(d) does not directly implicate rates, but rather, alleges that Graphnet was entitled to offset amounts owing to MCIT by credits due from MCII. Neither party has directly addressed the issue of whether that practice is governed by provisions of the tariff or whether it is capable of existing as an independent contract between the parties. Therefore, drawing all inferences in favor of the non-movant, the motion to dismiss the counterclaim will be denied to the extent that it alleges a contractual right to offset charges owing to MCIT by payments due from MCII.

Likewise, paragraph 26(e) does not directly implicate rates, but rather, claims entitlement to credits for traffic-minute and call-count discrepancies due to service interruptions and disconnected calls. Although I presume that the tariff would likely control

that matter, neither party has directly addressed the question. The motion to dismiss will therefore also be denied to the extent that the counterclaim alleges a contractual right to such credits.