131 F.3d 145
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
AT & T CORP., a New York corporation, Plaintiff-Appellee,
v.
FLEMING and BERKLEY, a limited partnership; and Frederick
J. Fleming, an individual, Defendants-Appellants.
 No. 96-55212.
 United States Court of Appeals, Ninth Circuit.
 Submitted June 5, 1997.
Filed Nov. 25, 1997.
 
 1
 Appeal from the United States District Court for the Central District of California, No. CV-94-6024-GHK; George H. King, District Judge, Presiding.
 
 
 2
 Before: Brunetti and O'Scannlain, Circuit Judges, and Hogan, Chief District Judge.
 
 
 3
 Appellants, Fleming and Berkley, a law partnership (F & B), and Frederick J. Fleming (Fleming) an individual, appeal the grant of summary judgment in favor of AT & T Corp., in AT & T's action under 47 U.S.C. § 203 to recover $35,636.82 in unpaid telephone bills. Appellants assert that there is at least a triable issue of fact whether calls placed by a criminal "hacker" from an off-premises location, "originated at" appellants' number such that appellants are liable for the calls. Appellants also argue that it is unjust and unreasonable under 47 U.S.C. § 201(b) for AT & T to charge appellants for allegedly fraudulent calls, and that triable issues of fact remain regarding state and common law affirmative defenses asserted by appellants in this case. Finally, appellants argue that the district court's denial of appellants' request for oral argument was reversible error. We affirm.
 
 FACTS
 
 4
 AT & T sued to recover $35,636.82 in unpaid telephone bills from appellants. The bills were for long distance telephone services billed to appellants, F & B, a law firm, and Fleming, the general partner of F & B, using AT & T's Long Distance Message Telecommunications Service (LDMTS), and AT & T's PROWATS discount plan.
 
 
 5
 LDMTS is an outbound calling service which allows customers to make domestic and international long distance calls. On or about January 7, 1990, and December 12, 1992, appellants subscribed to a regulated interstate service from AT & T and established an AT & T PROWATS service with AT & T. By subscribing to PROWATS, the subscriber requests that all outbound calls be transmitted by AT & T. The terms and conditions under which appellants subscribed to PROWATS Service are set forth in AT & T Tariff FCC No. 1, § 2.4.1.A (Tariff 1).
 
 
 6
 The telephone equipment in Fleming's office was not manufactured, sold, or leased by AT & T. Further, AT & T did not install, service, maintain, or have access to appellants' telephone equipment. The lessor of appellants' telephone equipment was PacTel. Through arrangement with appellants, PacTel installed telephone equipment, including a private branch exchange (PBX) system, in appellants' offices.
 
 
 7
 Between August, 1992, and January, 1993, Fleming incurred AT & T LDMTS charges. The charges were detailed in monthly invoices mailed to Fleming by AT & T. Fleming disputed and refused to pay $35,636.82 of the calls attributed to him. Fleming contended that a criminal "hacker," invaded his phone system and placed long distance calls through his phone system without his knowledge or consent.
 
 
 8
 PacTel investigated the disputed calls and determined the mechanism by which the allegedly fraudulent calls were placed. According to appellants, PacTel discovered that individuals were able to call into appellants' telephone system on one of appellants' "8OO" numbers after hours, when the office phone system would automatically forward all calls to an off-premises answering service. During a three second delay, the alleged perpetrators would access appellants' local dial tone, and, thereby, appellants' PROWATS line.
 
 
 9
 After discovering that allegedly fraudulent calls had been made from their telephone line, appellants modified their system. On the advice of PacTel, appellants installed an in-house voice mail system which obviated the need for the after hours off-premises answering service. Appellants did not experience any further problems with allegedly unauthorized calls after the modifications.
 
 
 10
 AT & T's first amended complaint alleged a single cause of action for failure to pay the disputed charges in violation of Tariff 1.
 
 STANDARD OF REVIEW
 
 11
 A grant of summary judgment is reviewed de novo. Jones v. Pacific Union R.R., 968 F.2d 937, 940 (9th Cir.1992). The appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1994).
 
 DISCUSSION
 I. AT & T Tariff F.C.C. No. 1 (LDMTS)
 
 12
 AT & T is a common carrier providing interstate telecommunication services, and is required to file tariffs with the Federal Communications Commission (FCC). See 47 U.S.C. § 203(a)--(b). Tariffs are public documents setting forth the terms and conditions of the common carrier's services and rates. Tariffs filed with the FCC are not mere contracts, but rather have the force of law. Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520 (1939); Carter v. American Tel. & Tel. Co., 365 F.2d 486, 496 (5th Cir.1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law."). Telecommunication customers are presumed to know the terms of the relevant tariffs. Marco Supply Co. v. AT & T Communications, Inc., 875 F.2d 434, 436 (4th Cir.1989).
 
 
 13
 In accordance with the provisions of 47 U.S.C. § 203, AT & T filed schedules of its rates and charges with the F.C.C., together with all the rules, regulations, and classifications used by AT & T in the conduct of its long distance telephone business. These schedules include Tariff 1, which delineates the payment obligations of a customer whose communications systems are connected to AT & T's LDMTS. Tariff 1 provides, in relevant part, that the customer is responsible for payment of bills for LDMTS calls or service that "[o]riginated at the Customer's number(s)." Tariff FCC No. 1, § 2.4.1.A.
 
 
 14
 The parties dispute whether the calls at issue "originated at" appellants' number within the meaning of Tariff 1. Appellants contend, as they did before the district court, that there is at least a triable issue of fact whether the calls "originated" at their number, where, allegedly, the calls were not authorized by them, and were placed by a criminal hacker from a location "miles away."[1] According to appellants, the term "originated," as it appeared in Tariff 1, is ambiguous. Citing several district court decisions which previously had addressed the issue of liability for calls placed by criminal hackers, the district court ruled that, as a matter of law, the disputed calls originated at appellants' number. Appellants appeal the district court's determination.
 
 
 15
 Appellants are not the first alleged victims of telephone fraud to assert that unauthorized, off-premises calls, did not originate at their number. The same argument has been addressed and rejected by the FCC. See Chartways Technologies, Inc. v. AT & T Communications, 6 F.C.C.R. 2952 (1991), aff'd, 8 F.C.C.R. 5601 (1993) (Pursuant to Tariff 1, customer liable for all long-distance calls placed through its on-premises phone system, regardless of whether such calls were authorized or fraudulent) Directel Inc. v. American Tel. & Tel. Co., 11 F.C.C.R. 7554 (1996) (unauthorized off-premises calls made through a customer's PBX, originate at the customer's number). In Directel, the Common Carrier Bureau noted, citing Chartways, that absent evidence that the customer lacked the ability to control fraudulent calling, Tariff 1 places responsibility for fraudulent calls on the customer. Id. The F.C.C., thus, has ruled that in circumstances such as presented in this case, under Tariff 1 the customer is liable for fraudulent calls. This Court must accord great deference to this determination. See F.C.C. v. WNCN Listeners Guild, 450 U.S. 582, 598 (1981) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong.") (quoting Red Lion Broad, Co. v. FCC, 395 U.S. 367, 381 (1969) (internal quotation marks omitted)).
 
 
 16
 Several district courts have also considered, and unanimously rejected, the argument that unauthorized, off-premises calls do not "originate at" the customer's number. See, e.g., American Tel. & Tel. Co. v. Intrend Ropes & Twines, Inc., 944 F.Supp. 701 (C.D.Ill.1996); American Tel. & Tel. Co. v. Community Health Group, 931 F.Supp. 719 (S.D.Cal.1995); American Tel, & Tel, Co. v. Jiffy Lube Int'l, Inc., 813 F.Supp. 1164 (D.Md.1993); American Tel. & Tel. Co. v. New York Human Resources Admin., 833 F.Supp. 962 (S.D.N.Y.1993).
 
 
 17
 In American Tel. & Tel. Co. v. Jiffy Lube, the court granted AT & T's motion for summary judgment, rejecting Jiffy Lube's claim that the LDMTS calls made by unauthorized callers using Jiffy Lube's remote access feature did not "originate" at Jiffy Lube's number. The court stated:
 
 
 18
 [T]here is no question concerning the applicable meaning of the word "originated" as used in the Tariff. Indeed, the meaning of the Tariff is unambiguous. The Tariff squarely places responsibility upon a customer such as Jiffy Lube for calls, whether or not authorized, which "originated" at the customer's number.... Thus, in a case like this one, the word "originated" means that the calls in issue originated at Jiffy Lube's number when, after the "computer hacker" dialed the MCI 800 number and after the hacker reached that number and dialed the code ... the hacker was thereby able to access the AT & T long distance line running out of Jiffy Lube's Baltimore office.
 
 
 19
 American Tel. & Tel. Co. v. Jiffy Lube, 813 F.Supp. at 1167.
 
 
 20
 In American Tel. & Tel. Co. v. New York Human Resources Admin., the city of New York (City) purchased a PBX system from Northern Telecom. A telephone hacker manipulated the PBX so as to allow any off-premises callers to fraudulently place long-distance calls. Consequently, the City received a bill in the amount of $529,000 for unauthorized calls. The City argued that it was not obligated to pay the disputed calls pursuant to Tariff 1 because the calls "originated" at the handset where the unauthorized off-premise callers placed the long-distance calls. The court rejected this argument, finding that the plain meaning of Tariff 1 required the conclusion that the remote unauthorized calls placed through the City's PBX "originated at" the City's PBX. 833 F.Supp. at 973. The court noted that adopting the City's interpretation of Tariff 1 would lead to a "nonsensical result": authorized off-premises callers could escape paying for their long-distance calls by arguing that their calls did not originate from the City's PBX. Id. at 973.
 
 
 21
 In Industrial Leasing Corp. v. GTE Northwest Inc., 818 F.Supp. 1372 (D.Or.1992), Industrial Leasing Corp. (ILS) argued that it was not responsible for unauthorized long-distance calls made by off-premises callers because the calls did not "originate" from ILC as defined in the relevant tariffs. The court stated:
 
 
 22
 [L]iability for long distance charges depends upon where access to the AT & T long distance line originates. I agree with AT & T that ILC's long distance service originates with the GTE system [PBX], through which all of ILC's long distance calls start.... [T]he tariff allows billing for calls originating at ILC's numbers, and therefore unambiguously applies to the charges incurred through unauthorized access to the communications system purchased by ILC from GTE.
 
 
 23
 Id. at 1374-75; see American Tel. & Tel. Co. v. Community Health Group, 931 F.Supp. at 725 (rejecting argument that "originates at" is ambiguous, and noting, "Defendants' ambiguity arguments are not new, and have been compellingly dispatched by every court that has considered them under analogous circumstances.").
 
 
 24
 Appellants contend that "no reasonable person reading [Tariff 1]" could interpret "originate" to include unauthorized calls placed from an off-premises telephone. Although the Ninth Circuit has not addressed this issue, the above cited cases are persuasive. Unauthorized long-distance calls from a customer's number, which are engineered by a telephone hacker from an off-premises location, "originate" at the customer's number. A contrary determination would produce the same absurd result described in American Tel. & Tel. Co. v. New York Human Resources Admin.: customers could challenge charges for all off-premises calls placed through an on-site PBX, whether authorized or not.
 
 
 25
 Appellants try to distinguish the above cited cases on the basis that each case involved a large corporate entity that employed a telephone system with a "remote access" feature. Such a feature enables a customer to access his office phone system from a remote location by dialing into the system and entering the appropriate code. Appellants contend that a remote access feature is "fraught with peril for the customer" and, thus, was intentionally absent from appellants' telephone system. However, not all of the above cited cases involve telephone systems expressly designed with remote access features. For example, the telephone system at issue in American Tel. & Tel. Co. v. New York City Human Resources Admin., 833 F.Supp. at 973, was not "expressly designed" with a remote access feature. Rather there, hackers were able to manipulate the PBX, which, as in this case, was not purchased, installed, or maintained by AT & T, in order to gain access from a remote location. Further, there is agreement among the district courts that have considered the issue, that the presence or absence of a remote access feature does not affect the origination determination. Industrial Leasing Corp. v. GTE Northwest, Inc., 818 F.Supp. at 1374-75; American Tel. & Tel. Co. v. New York City Human Resources Admin., 833 F.Supp. at 973.
 
 
 26
 Appellants also argue that because Fleming is a solo-practitioner attorney, who runs a "one horse" law firm, he should be treated differently than the large corporate or municipal entity appellants involved in many of the above cited cases. Thus, appellants suggest that it is inequitable for AT & T to bill them for unauthorized calls. However, pursuant to the "filed tariff doctrine," also known as the "filed rate doctrine," courts have uniformly refused to apply principles of equity to estop the enforcement of terms in a filed tariff, such as Tariff 1. See Maislin Indus. U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126-27, 110 S.Ct. 2759, 111 L.Ed. 94 (1990) (Interstate Commerce Act's ("ICA") "filed rate doctrine" forbids equitable defenses to the collection of the filed tariff), superseded by statute 49 U.S.C. § 10701; Illinois Central Gulf R.R. Co. v. Golden Triangle Wholesale Gas Co., 586 F.2d 588, 592 (5th Cir.1978) ("Equitable considerations cannot justify a carrier's failure to collect authorized tariff charges, nor can they be invoked as a basis for an estoppel to collect such charges.") (citation omitted). In the context of the ICA, the Supreme Court has explained the rationale underlying the filed rate doctrine:
 
 
 27
 Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.
 
 
 28
 Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94, 97 (1915).
 
 
 29
 The filed tariff doctrine has been applied to the Communications Act of 1934, 47 U.S.C. §§ 151-613. Central Office Tel., Inc. v. American Tel. & Tel. Co., 108 F.3d 981 (9th Cir.1997); Marco Supply Co. v. AT & T Communications, Inc., 875 F.2d 434 (4th Cir.1989); American Tel. & Tel. Co. v. New York City Human Resources Admin., 833 F.Supp. at 979 (Pursuant to filed tariff doctrine, the City was precluded from asserting principles of equity to avoid paying AT & T for unauthorized, fraudulent calls.). In this case, appellants suggest that, because of harsh consequences, they should be treated differently under Tariff 1 than larger entities similarly victimized by telephone fraud. What appellants request, however, is precisely what the filed tariff doctrine intends, in part, to prevent: unjust discrimination among customers.
 
 
 30
 Even if the court were to take the equities into account here, they would not favor appellants. AT & T did not manufacture, sell, or lease appellants' telephone equipment, and was not under contract with appellants to service or maintain appellants' telephone equipment. Moreover, AT & T did not, and could not, control access to appellants' phone system. The alleged hackers in this case invaded appellants' phone system through appellants' PBX and after hours off-premises answering service. This service, like the PBX itself, was not owned, operated, or maintained by AT & T. Appellants, unlike AT & T, did control access to their telephone system: once they discovered the alleged fraud in this case, they modified their system and prevented further abuse. Appellants could have prevented the alleged fraud in the first instance by not utilizing an off-premises answering service, or by using a system with effective security features. At the very least, appellants could have mitigated the extent of their loss by monitoring their phone system more closely. The disputed charges in this case accumulated over several months. See, e.g. American Tel. & Tel. Co. v. New York City Human Resources Admin., 833 F.Supp. at 979-80 (noting that even if equities were considered, they would not favor customer where AT & T did not install or maintain customer's phone system, and could not control, secure, or restrict access to customer's PBX, and customer could have, among other things, more closely monitored the use of its phone system, and prevented the fraud.).[2]
 
 
 31
 II. Just and Reasonable under 47 U.S.C. § 201(b)
 
 
 32
 47 U.S.C. § 201(b) provides that "[a]ll charges, practices, classifications, and regulations" related to communications services must be "just and reasonable." Appellants contend that AT & T's imposition of the unauthorized charges on appellants is unjust and unreasonable under 47 U.S.C. § 201(b). The D.C. Circuit rejected a similar argument in American Message Ctrs. v. F.C.C., 50 F.3d 35, 39 (D.C.Cir.1995). In American Message Centers, American Message Centers (AMC) refused to pay Sprint approximately $160,000 of allegedly unauthorized long-distance charges. The tariff at issue stated that the "subscriber shall be responsible for the payment of all charges for services provided under this Tariff." AMC argued that only a tariff stating that subscribers are responsible for all charges, including charges for toll fraud, would be sufficiently clear and definite to allow a carrier to charge consumers for unauthorized calls. The court disagreed, finding that the payment obligation was "clear and definite," and that "charging subscribers for unauthorized but completed calls [was] not an exception or condition to [the] general payment obligation." Id. Thus, charging subscribers for unauthorized calls satisfied section 201(b)'s "just and reasonable" requirement. Further, the F.C.C. has previously ruled that a carrier's attempt to collect unauthorized charges in toll fraud cases is not unreasonable if consistent with the terms of its tariff. MCI Telecomms. v. Ameri-Tel Inc., 852 F.Supp. 659, 664 (N.D.Ill.1994) (citing Chartways Techs., Inc. v. AT & T Communications, Inc.).
 
 
 33
 In this case appellants argue that holding customers liable for unauthorized charges violates section 201(b)'s mandate because AT & T can spread the risk of fraudulent calls across its customers, whereas appellants must bear the cost alone. Appellants made the same argument in the court below. The court responded:
 
 
 34
 [D]efendants' slightly different articulation of this defense does not lessen the force of the American Message Centers court's reasoning. Specifically, the tariff requires that customers pay for all completed calls charged to their number. Consideration of who better bears the risk does not change this result. Accordingly, defendants cannot withstand summary judgment on these grounds.
 
 
 35
 Memorandum and Order, Ex. 65 of Excerpt of Record, at 6. The district court appropriately rejected appellants' argument. The rationale of American Message Centers applies with equal force to this case. Tariff 1 provides that customers are responsible for payment of calls that "originate at the customer's number." Charging customers for unauthorized, but completed calls, falls under this general payment obligation, and, as a matter of law, is neither unjust, nor unreasonable.[3]
 
 
 36
 III. Appellants' Common-law Affirmative Defenses
 
 
 37
 Appellants claim that AT & T's attempt to collect payment from them for unauthorized calls placed through their phone system is barred by a number of state and common law affirmative defenses. In particular, appellants assert as affirmative defenses frustration of purpose, avoidance of forfeiture, failure of consideration, mistake, intervening criminal act of a third person, and assumption of risk. Appellee claims that these defenses are preempted by federal law. The district court did not reach this issue, as it found that appellants' state and common law defenses failed as a matter of law.
 
 A. Preemption
 
 38
 The Communications Act was implemented to "regulate all interstate ... communication by wire or radio and ... all persons engaged within the United States in such communication." 47 U.S.C. § 152(a). As a result of the broad provisions of the Communications Act, courts generally have held that state causes of action on regulated activities are preempted. Ivy Broadcasting v. American Tel. & Tel. Co., 391 F.2d 486, 491 (2d Cir.1968). In Ivy Broadcasting, the plaintiff charged AT & T with negligence in delay and installation and in operation of phone lines. The Second Circuit held that, "questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and ... the states are precluded from acting in this area." Id. at 491.
 
 
 39
 The force of Ivy Broadcasting has been softened by subsequent decisions that have allowed common law actions that do not challenge "practices expressly and exclusively regulated in ... 47 U.S.C. § 201." In re Long Distance Telecomms. Litigation, 831 F.2d 627 (6th Cir.1987) (quoting In re Long Distance Telecomms. Litigation, 598 F.Supp. 951, 954 (E.D.Mich.1984) (internal quotation marks omitted)).[4] Accordingly, courts have allowed state causes of action in the interstate communications context for, inter alia, fraud and deceptive trade practices, id., interference with contract and unfair competition, Cooperative Communications, Inc. v. AT & T Corp., 867 F.Supp. 1511 (D.Utah 1994), and invasion of privacy, Ashley v. Southwestern Bell Tel. Co., 410 F.Supp. 1389 (W.D.Tex.1976). These dispensations have been based on the "savings clause" of the Communications Act, which provides:
 
 
 40
 Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies.
 
 
 41
 47 U.S.C. § 414.
 
 
 42
 Appellants argue that the savings clause preserves their common law claims in this case. Appellants' claims for frustration of purpose, avoidance of forfeiture, failure of consideration, mistake, intervening criminal act of a third person, and assumption of risk all relate to AT & T's billing them for charges allegedly due for long distance calls provided pursuant to Tariff 1. In Chartways Techs., Inc. v. AT & T Communications, supra, the F.C.C. ruled that long distance providers may bill customers for fraudulent telephone calls. Appellants' state law claims, were they allowed, clearly would conflict with this ruling, and interfere with the Commission's authority. C.f. Cooperative Communications, Inc. v. AT & T Corp., 867 F.Supp. at 1516 ("State law remedies which do not interfere with the Federal government's authority over interstate telephone charges or services, and which do not otherwise conflict with an express provision of the Act, are preserved by section 414.") (internal citation and quotation marks omitted). Further, as appellants' payment obligations for telephone service are expressly and exclusively regulated by the Communications Act, appellants' common law claims in this case are preempted.
 
 B. Filed Tariff Doctrine
 
 43
 Even if appellants' common law claims were not preempted, they nonetheless, would be precluded by the filed tariff doctrine. The filed tariff doctrine, in addition to barring equitable defenses as indicated above, bars common law defenses or counterclaims relating to charges made pursuant to a tariff that are not specifically afforded in the relevant federal act. Reiter v. Cooper, 507 U.S. 258, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In Reiter, the Supreme Court explained, "[t]he filed rate doctrine embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate." Id.; Armour Packing Co. v. United States, 209 U.S. 56, 81 (1908) (filed tariff doctrine trumps contract defenses); Wegoland, Ltd. v. NYNEX Corp., 27 F.3d 17, 20 (2d Cir.1994) (filed tariff doctrine precludes fraud claims).
 
 
 44
 Appellants suggest that the filed tariff doctrine is not applicable to their common law claims because they are not challenging the amount of the rate indicated in Tariff 1, but the fact that they have been charged any rate at all for the disputed calls. Appellants are correct that in many of the cases cited by appellee in which the filed tariff doctrine is applied, the appropriate rate is disputed, and not the propriety of any rate at all, see, e.g., Marco Supply Co. v. AT & T Communications, Inc., 875 F.2d at 436 (regulated carrier "must charge the tariff rate established with the appropriate regulatory agency, even if it has quoted or charged a lower rate to its customer"); however, the significance of this distinction is not explained by appellants. The purpose of the filed tariff doctrine is, among other things, to prevent unjust discrimination among rate payers through uniform adherence to the filed rate. It is difficult to conceive of how allowing appellants to pay nothing at all for long distance calls that originated at their number would not implicate the filed tariff doctrine, whereas allowing them merely to pay a different rate would implicate the doctrine. C.f. Central Office Tel., Inc. v. American Tel. & Tel. Co., 108 F.3d at 990 (filed tariff doctrine does not apply where case did not involve rates or rate-setting, but provisioning of services and billing under several contracts).
 
 
 45
 Finally, even if the filed tariff doctrine does not apply to appellants' asserted common law defenses, the defenses do not enable appellants to survive summary judgment in this action. The district court held that appellants' defenses
 
 
 46
 are all variations on a single theme, i.e., that defendants are not liable for unauthorized calls charged to their numbers. However, the cases cited supra plainly hold that defendants are indeed liable for those charges. Defendants cannot avoid this result by means of their manipulation of various contract-based and tort-based common law defenses, because these defenses are not cognizable as a matter of law in this context.
 
 
 47
 Memorandum and Order, Ex. 65 to Excerpt of Record, at 6-7. The district court properly dispensed with appellants' common law claims. Because appellants clearly are liable for the disputed calls under Tariff 1, appellants cannot demonstrate that appellee breached any lawful duty or contractual term in endeavoring to collect for the calls from appellants.
 
 IV. Denial of Request for Oral Argument
 
 48
 Appellants argue that the district court's refusal to grant oral argument on appellee's motion for summary judgment was reversible error. Fed.R.Civ.P. 78 provides, in part:
 
 
 49
 To expedite its business, the court may make provision by rule or order for the submission and determination of motions without oral hearing upon brief written statements of reasons in support and opposition.
 
 
 50
 A district court's failure to grant an oral hearing on a motion for summary judgment does not constitute reversible error in the absence of prejudice. Houston v. Bryan, 725 F.2d 516, 518 (9th Cir.1984). Here, appellants claim they were prejudiced because they were not able to argue the merits, and establish in their estimation the "dubious precedential value" of various cases cited by appellee in its reply memorandum, and relied on by the district court in its memorandum order granting summary judgment. However, appellants do not indicate what actual arguments they were not able to make, as opposed to what cases they were not able to discuss, because of the absence of oral argument. In fact, it appears that all of the arguments made by appellants on this appeal, save this one, were made below in appellants' papers. Thus, prejudice is lacking. See Id. (Prejudice lacking where no arguments on appeal of which the district court was not apprised.). The district court's refusal to grant oral argument on appellee's motion for summary judgment was not reversible error.
 
 
 51
 The judgment of the district court is AFFIRMED
 
 
 
 [1]
 AT & T does not dispute appellants' claim that the calls at issue were placed by a criminal hacker from outside appellants' office
 
 
 [2]
 The court appreciates appellants' displeasure with having to pay for calls that they apparently did not make. Nonetheless, the circumstances of this case do not permit any other solution. This Court does not intend to suggest that its holding today should apply, generally, to cases of telephone fraud, and cases in which the customer maintains less control over the accessed system may be distinguishable. Nor does this court intend to influence in any manner the F.C.C.'s evaluation of telephone fraud liability, which apparently, is ongoing, or any congressional activity in this area. Credit card fraud protections enacted by Congress to limit loss that may be attributed to a customer are well known. Congress, of course, may pass similar legislation for telephone fraud. This court, however, cannot legislate for Congress
 
 
 [3]
 Appellants also contend that there is an issue of fact whether they "controlled" the phone line at issue at all relevant times, and whether plaintiffs accurately billed appellants for the calls at issue. Appellants raised the same arguments below. The district court found correctly that appellee's evidence on these points was unrebutted
 
 
 [4]
 The standard for determining whether state law claims asserted in the context of interstate communications are preempted has been expressed in a number of different ways. For example, in MCI Telecommunications Corp. v. Graphnet Inc., 881 F.Supp. 126, 131-32 (D.N.J.1995), the court suggested that preemption occurs where a cause of action "arises in direct relation to the provision of interstate communications services." Id. In Kaplan v. ITT-U.S. Transmission Systems, Inc., 589 F.Supp. 729, 736 (E.D.N.Y.1984), the court indicated that state law claims are not preempted where, "the common law causes of action challenge conduct that is not contemplated by the Communications Act." Id