**AT & T CORP., Plaintiff,**

v.

**COMMUNITY HEALTH GROUP; Centro De Salud De La Comunidad De San Ysidro, Inc., d/b/a San Ysidro Health Center, Defendants.**

**Civil No. 94–1526–K(LSP).**

United States District Court,
S.D. California.

Oct. 18, 1995.

Sheldon Michaels, Michael P. Hurst, AT & T, San Francisco, CA, James D. Gustafson, Law Office of James D. Gustafson, Los Angeles, CA, for AT & T Corporation.

Matthew V. Herron, Meisenheimer and Herron, San Diego, CA, George J. Schultz, Bauer and Schultz, Chula Vista, CA, for Community Health Group, and Centro de Salud de la Comunidad De San Ysidro, Inc.

David James Benner, Pacific Bell Legal Department, San Diego, CA, for Pacific Bell Inc.

---

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

KEEP, Chief Judge.

On October 10, 1995, Plaintiff AT & T Corp.'s motion for summary judgment came on regularly for hearing. Defendants Community Health Group ("CHG") and Centro De Salud De La Comunidad De San Ysidro, Inc., d/b/a San Ysidro Health Center ("SYHC"), opposed. James D. Gustafson, Esq., appeared on behalf of Plaintiff. George J. Schultz, Esq., of Bauer & Schultz appeared on behalf of Defendants.

## FACTUAL BACKGROUND

As this case was so recently before the Court, the Court incorporates by reference the statement of facts from its oral ruling of August 28, 1995. CHG is a non-profit HMO, and SYHC is a related health care provider. AT & T filed a complaint against CHG on October 3, 1994, to recover over $80,000 of long-distance telephone charges placed by a computer "hacker" who illegally gained access to Defendants' phone system in September and October of 1992. On August 28, 1995, this Court granted Plaintiff's motion to amend its complaint to add SYHC as a Defendant. Plaintiff now moves for summary judgment, and Defendants oppose.

## DISCUSSION

### I. Defendants' Cross–Motion for Summary Judgment

On September 26, 1995, Defendants filed their opposition to the instant motion for summary judgment, and concurrently filed a pleading styled "cross-motion for summary judgment" listing October 10, 1995 as the hearing date. Defendants did not properly calendar their purported "cross-motion" by obtaining a hearing date from chambers as required under Local Rule 7.1(b)(2), nor did they timely file the motion for an October 10 hearing date under the 28–day rule set forth in Local Rule 7.1(e)(1). Accordingly, the Court does not consider Defendants' "cross-motion" herein.

### II. Plaintiff's Motion for Summary Judgment

The Court incorporates by reference Fed.R.Civ.P. 56(c). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The moving party has the initial burden of demonstrating that summary judgment is proper. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970).

The burden then shifts to the nonmovant to show that summary judgment is not appropriate. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. To make such a showing, the nonmovant must go beyond the pleadings to designate specific facts indicating a genuine issue for trial. *Id.* In considering the specific facts offered by nonmovant, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all justifiable inferences in favor of nonmovant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). However, if the nonmovant's evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11.

■■■ Plaintiff's first amended complaint alleges a single cause of action for failure to pay long distance telephone charges that were placed through Defendants' telephone system for the months of September and October 1992. Plaintiff alleges that, prior to January 1992, Defendants subscribed to AT & T Long Distance Message Telecommunications Service ("LDMTS"). Under the Communications Act of 1934, 47 U.S.C. § 151 *et seq.,* AT & T is a common carrier providing interstate telecommunications services, and is required to file tariffs with the Federal Communications Commission ("FCC"). Tariffs are public documents setting forth the terms and conditions of the common carrier's services and rates. Under AT & T Tariff FCC No. 1, § 2.4.1.A,

> [t]he Customer is responsible for placing any necessary orders and complying with tariff regulations for LDMTS and for assuring that its Users comply with tariff regulations. The Customer is also responsible for the payment of bills for LDMTS. This includes payment for LDMTS calls or services:
> —Originated at the Customer's number(s),
> —Accepted at the Customer's number(s) (e.g., Collect Calls),
> —Billed to the Customer's number via Third Number Billing if the Customer is found to be responsible for such call

> or service, the use of a Calling Card, the use of AT & T EasyReach Service, or the use of a Company-assigned Special Billing Number, and
> —Incurred at the specific request of the Customer.

Plaintiff's sole cause of action alleges violation of Tariff No. 1. Plaintiff argues that it is entitled to summary judgment because there is no material factual dispute that (1) SYHC was a "customer" under Tariff No. 1; (2) the calls at issue "originated" from SYHC's telephone numbers; (3) Plaintiff billed SYHC for the calls; and (4) SYHC refused to pay. Defendants argue, however, that (1) SYHC was not Plaintiff's "customer" under Tariff No. 1, (2) SYHC took affirmative measures to safeguard its phone system, (3) Plaintiff failed to take reasonable measures to prevent fraud, and (4) Tariff No. 1 is vague and ambiguous and must be construed against AT & T. The Court addresses these arguments in turn.

A. *Defendants Were "Customers" Under Tariff No. 1*

■■■ Under AT & T Tariff No. 1 § 2.10, the term "customer" is defined as "the person or legal entity which orders LDMTS (either directly or through an agent) and is responsible for payment of tariffed charges for services furnished to that Customer." The FCC has held that a party can "order" LDMTS and thus become an AT & T "customer" by either (1) "affirmatively" ordering the service through, e.g., presubscribing to AT & T LDMTS, or (2) "constructively" ordering AT & T LDMTS and creating an "inadvertent carrier-customer relationship" by failing to take steps to control unauthorized charging of AT & T long distance calls to the party's telephone number. *United Artists Payphone Corp. v. New York Tel. Co.,* 8 F.C.C.R. 5563, 5565–66, 1993 WL 757204 (1993). The FCC's interpretation of tariff provisions is afforded great deference because "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. . . ." *F.C.C. v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981).

It is undisputed here that Defendants did not affirmatively order AT & T LDMTS, and instead presubscribed for long-distance service with a different carrier, Express Tel. Plaintiff argues that Defendants constructively ordered AT & T LDMTS. Defendants assert, however, that SYHC took "affirmative measures" to safeguard its phone system because SYHC allegedly relied on the anti-fraud expertise of Centrex Equipment Associates, Inc. ("Centrex"), and Pacific Bell ("PacBell"), who leased, installed, configured, and maintained the automated attendant and phone lines attached to SYHC's private branch exchange ("PBX") system.[1] It is undisputed that Defendants had full custody and control of their telephone system at all relevant times, and that the system was not manufactured, installed, maintained, or controlled by AT & T. SYHC claims that it relied on Centrex and PacBell because SYHC itself "had no knowledge" in the area of telephone fraud. However, SYHC provides no explanation of *how* it relied on Centrex and PacBell, and no evidence that Centrex or PacBell had represented to SYHC that they would institute any anti-fraud measures until after all the parties had been apprised by AT & T of the fraudulent calling patterns.

Indeed, other than the conclusory assertion that SYHC took "affirmative safeguarding measures," Defendants have come forth with no showing that they acted in any way to control the unauthorized charging of AT & T LDMTS calls to their system before the fraud occurred. All of Defendants' declarants state that prior to the incidents at issue here, SYHC's directors and employees were "not [even] aware of the issue of toll fraud being a problem anywhere." Defendants have presented no evidence that they or their equipment lessors took any steps to implement line-blocking features, institute an operator-screening service, undertake their own line-monitoring, or follow any of the other "affirmative safeguarding measures" that the FCC has recognized as a valid de-

fense to a "constructive ordering" allegation. *E.g., United Artists Payphone Corp.,* 8 F.C.C.R. at 5566; *In the Matter of Atlantic Telco and Tel & Tel Payphones, Inc.,* 8 F.C.C.R. 8119, 8120, 1993 WL 468173 (1993). Defendants' declarants uniformly testified that no such protective measures were instituted until *after* AT & T contacted SYHC in October 1992 to inform SYHC of the unusual calling activity on its lines.

The Court finds that Defendants' declarations regarding "constructive ordering" do not create a triable issue of fact, and that no genuine dispute exists as to whether SYHC was AT & T's "customer." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Under all the applicable authority, SYHC was AT & T's inadvertent "customer."

**B.** *The Calls "Originated" from Defendants' Telephone Numbers*

Plaintiff argues that the calls at issue "originated" from Defendants' telephone numbers because computer "hackers" were able to access AT & T's long-distance service through Defendants' on-premises PBX system. Defendants do not challenge the fact that the calls were placed through SYHC's PBX system. Plaintiff correctly notes that a customer is liable for *all* long-distance calls made from its on-premises PBX, regardless of whether such calls were authorized or fraudulent. *Chartways Tech., Inc. v. AT & T Communications,* 6 F.C.C.R. 2952, 2954, 1991 WL 640363 (1991).

Furthermore, the presence of a remote access mechanism, including an off-premises computer, does not affect the "origination" determination; calls still "originate" from a customer's PBX system even if access to the PBX was gained from a remote location. *Industrial Leasing Corp. v. GTE Northwest, Inc.,* 818 F.Supp. 1372, 1374–75 (D.Or.1992); *American Tel. & Tel. Co. v. Jiffy Lube Int'l. Inc.,* 813 F.Supp. 1164, 1167 (D.Md.1993). This rule applies even if the customer's on-premises PBX system did not

---

1. A PBX system is "a customer-provided private switching system used to facilitate the transmission of telephone calls to, from, and within a place of business. It is equipment added to the public telephone network by a customer ... the use of which requires neither the knowledge nor approval of AT & T." *American Tel. & Telegraph Co. v. Jiffy Lube Int'l, Inc.,* 813 F.Supp. 1164, 1165 n. 1 (D.Md.1993).

originally include a remote access feature, and the PBX is manipulated by outside parties from a remote location. *American Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 973 (S.D.N.Y.1993). Accordingly, no material issue of fact exists as to whether the calls "originated" from Defendants' premises.

### C. Plaintiff Billed Defendants and Defendants Refused to Pay

It is undisputed that Plaintiff billed SYHC for $82,180.28 in long-distance telephone charges for September and October 1992, and that Defendants have refused to pay. Therefore, no material dispute exists as to this issue.

### D. AT & T's Alleged Duty to Take Reasonable Steps to Prevent Fraud

Defendants argue that a material issue of fact exists regarding AT & T's alleged duty to take reasonable steps to prevent fraud. Defendants cite a March 9, 1995 FCC "letter of admonition" to a common carrier, stating: "the Commission has concluded that carriers have an obligation to prevent toll fraud. In cases where the carrier was in the best position to prevent fraud but failed to take reasonable steps to prevent the fraudulent calls, the Commission will not impose liability on the subscriber of the originating phone." 10 F.C.C.R. 2754 (1995). The FCC's "letter of admonition" is inapposite for two reasons. First, the FCC's letter cites *United Artists Payphone Corp.*, 8 F.C.C.R. at 5566 n. 44, which describes a "screening service" that customers can order from carriers to inform operator service providers of any billing restrictions on lines to which a caller may seek to bill a call. Where a customer has affirmatively implemented anti-fraud devices such as line restrictions and screening services, the carrier that provides such restrictions and services will be in the "best position" to prevent fraud; the carrier has effectively been retained to monitor such fraud. Here, however, the Court has found on the record before it that Defendants implemented no such measures, and entered into no arrangements with AT & T to monitor SYHC's lines.

Second, the FCC's "letter of admonition" warns Oncor Communications, Inc. not to implement a long-distance access service that is "inconsistent with the Commission's rules and policies regarding operator services and toll fraud." The FCC found that Oncor's system used a "non-industry standard" that "thwart[s] the Commission's efforts to unblock 10XXX access in a way that is readily understandable and fair to both consumers and aggregators." Defendants here do not allege any such improper action by AT & T in the provision of its long-distance services.

Defendants merely argue that AT & T has sophisticated equipment that can track suspicious phone activity, and that therefore AT & T should have notified Defendants earlier regarding the instant fraud. SYHC's expert witness states that the fraudulent calls began on September 30, 1992, and continued through October 6, 1992, on which date AT & T notified SYHC of the suspicious calling pattern it had discovered. There was thus a seven-day period of fraudulent calling before AT & T gave its warning and SYHC requested a line-blocking service.

The Court finds not only that Defendants' authority is inapposite, but also that Defendants' "duty to warn" arguments have been considered and rejected in FCC cases with fact patterns similar to the instant case. In *Chartways Tech., Inc. v. AT & T Communications*, 8 F.C.C.R. 5601, 5604 (1993), for example, the FCC found that

> [the customer] has presented no persuasive evidence that AT & T was negligent with regard to the unauthorized calls. The record shows that AT & T did not have the ability to determine whether the particular ... calls were authorized or to monitor LDMTS calls in real time. The record also shows that AT & T did not represent to its customers that it had such capabilities. More generally, [the customer] fails to cite any authority or provide a persuasive argument to support its contention that AT & T had, at the time these fraudulent calls occurred, an affirmative duty to warn [the customer] about toll fraud risks.

Similarly, in *New York City Human Resources Admin.*, 833 F.Supp. at 977, the Court held that "the repeated occurrence of

remote access fraud does not create a general duty on AT & T's part to warn its LDMTS customers of the possibility of unauthorized access to their PBX because the applicable Tariff does not impose such a duty. The conclusive and exclusive rights and liabilities of carriers are enumerated in their tariffs." AT & T persuasively argues in the instant motion that it did not have the ability, the authority, or the duty to determine whether particular calls were authorized by SYHC before letting the calls be placed through SYHC's system. Accordingly, the Court finds that Defendants have failed to raise a triable issue of fact as to their "duty to warn" and "duty to prevent fraud" arguments.

### E. The "Vagueness" of Tariff No. 1

Finally, Defendants argue that the terms "customer," "ordered," and "originate" are "not defined in Tariff No. 1 in a way which would encompass the situation presented here." The Court rejects this argument. As noted already in the Court's discussion of whether SYHC was a "customer" under Tariff No. 1, the term is explicitly defined in the Tariff, and the FCC has provided a specific test for determining "customer" status. Within the "customer" test, the FCC also provides explicit guidance as to what actions constitute an "order" for AT & T's services. The FCC's tests are workable and have permitted this Court to interpret the Tariff's definitions on the facts of this case. *See Industrial Leasing Corp.*, 818 F.Supp. at 1374–75; *Chartways*, 6 F.C.C.R. at 2954. Similarly, the Court adopts the rationale of *Jiffy Lube Int'l*, 813 F.Supp. at 1167, and *New York City Human Resources Admin.*, 833 F.Supp. at 973–74, in finding that the term "originate" is also unambiguous. As Plaintiff correctly points out, Defendants' ambiguity arguments are not new, and have been compellingly dispatched by every court that has considered them under analogous circumstances. For all these reasons, the Court finds that there is no material issue of fact as to Defendants' ambiguity arguments. Accordingly, Plaintiff's motion for summary judgment is granted.

### III. Evidentiary Objections

As the Court has not relied in this ruling on any of the items to which Defendants filed objections, the Court need not address their objections on the merits. In light of the Court's holding granting Plaintiff's motion, the Court also need not reach Plaintiff's evidentiary objections.

### CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment is GRANTED.

IT IS SO ORDERED.