**AMERICAN TELEPHONE and TELE-GRAPH COMPANY, a New York Corporation, Plaintiff,**

v.

**INTREND ROPES & TWINES, INC., an Illinois Corporation f/d/b/a Intrend Technologies, Inc., and Aamstrand Ropes & Twine, Inc., an Illinois Corporation, Defendants and Third–Party Plaintiffs,**

v.

**ILLINOIS BELL TELEPHONE COMPANY, an Illinois Corporation, Third–Party Defendant.**

No. 96–1345.

United States District Court, C.D. Illinois.

Oct. 3, 1996.

---

Walter Jones, Jr., Jorge V. Cazares, Stephen H. Pugh, Brian Witus, Pugh Jones & Johnson PC, Chicago, IL, for American Tel. and Tel. Co.

Terrence J. Gaffney, Law Offices of Terrence J. Gaffney, Oak Brook, IL, L. Dilene Bishop, Bishop and Bishop PC, Oak Brook, IL, for Intrend Ropes & Twines, Inc., Aamstrand Ropes & Twines, Inc.

Patrick J. Kilroy, Jr., Maureen T. O'Donnell, Chicago, IL, Paul G. Foran, Lueders Robertson & Konzen, Danville, IL, for Illinois Bell Telephone Co.

### ORDER

McDADE, District Judge.

Before the Court is Plaintiff's Motion to Reconsider or Alternatively to Certify Judge Harold A. Baker's Order [Doc. # 64] for Interlocutory Appeal. [Doc. # 75–76]. For the reasons set forth below, this Court GRANTS Plaintiff's Motion.

### PROCEDURAL HISTORY

On November 29, 1993, Plaintiff, the American Telephone and Telegraph Company ("AT & T"), filed suit against Defendants, Intrend Ropes & Twines Inc., f/d/b/a Intrend Technologies, Inc. ("Intrend"), and Aamstrand Ropes & Twines, Inc. ("Aamstrand"), for the collection of Long Distance Telecommunications Service ("LDMTS") and Wide Area Telecommunication Service ("WATS") charges that they allegedly incurred.

On September 13, 1995, AT & T filed a motion for summary judgment against Defendants Intrend and Aamstrand jointly, or Defendant Intrend individually on the basis that no material question of fact existed as to whether Defendants were liable for the WATS and LDMTS charges. [Doc. # 32]. On November 8, 1995, Intrend and Aamstrand filed their response to AT & T's motion. [Doc. # 42]. On March 20, 1996, Magistrate Judge Bernthal issued a Report and Recommendation ("R & R") in which he granted AT & T's motion for summary judgment in its entirety as to Defendant Intrend and denied the motion as to Defendant Aamstrand. [Doc. # 59]. On April 2, 1996, Intrend and Aamstrand filed their objections to Magistrate Judge Bernthal's report and recommendation. [Doc. # 60]. On June 25, 1996, District Judge Harold A. Baker rejected the report and recommendation and denied AT & T's motion for summary judgment. [Doc. # 64].

Consequently, on July 8, 1996, Plaintiff AT & T filed a motion to disqualify Judge Baker because of a potential conflict of interest and to vacate his Order denying summary judgment. (See Doc. # 65 *citing* ABA Judicial Canons of Ethics and Judiciary & Judicial Procedure 28 U.S.C. § 455 et seq.). Judge Baker subsequently recused himself on July 12, 1996, and the case was reassigned to this Court by Chief Judge Michael M. Mihm on July 16, 1996. Accordingly, Plaintiff AT & T renewed its motion to vacate Judge Baker's Order denying Plaintiff's Summary Judgment Motion. [Doc. # 69, 7/30/96]. However, on August 8, 1996, this Court denied AT & T's renewed motion because "Plaintiff AT & T failed to allege actual prejudice or impropriety by [Judge] Baker." [Doc. # 72 at p. 3]. Finally, on September 12, 1996, AT & T filed a Motion for Reconsideration of Judge Baker's Order denying Plaintiff's Motion for Summary Judgment or Alternatively for an Order to Certify the Issue for Interlocutory Appeal. [Doc. # 75–76]. Finally, on September 30, 1996, Defendants Intrend and Aamstrand filed Defendant and Third Party Plaintiffs' Response and Objection to Motion of Plaintiff AT & T for Reconsideration. [Doc. # 79].

### FACTUAL BACKGROUND

The following facts, as set out in Magistrate Judge Bernthal's Report and Recom-

mendation, are undisputed.[1] Defendant Intrend, formerly doing business as Intrend Technologies, Inc., and Defendant Aamstrand are Illinois corporations with their principal place of business located in Manteno, Illinois. Plaintiff AT & T is a common carrier engaged in the provision of interstate and foreign telecommunications services, and during the time at issue in its Complaint, provided Long Distance Telecommunications Service ("LDMTS") and Wide Area Telecommunications Service ("WATS") to Defendant Intrend pursuant to the terms and conditions of tariffs on file with the FCC.

In May of 1989, Intrend moved to its present location in Manteno, Illinois, and contracted with a telecommunications consulting company called "Nitec" to advise, design, purchase, and install a telecommunications system in the Intrend's new facility. Nitec subsequently purchased and installed for Intrend four AT & T Spirit 6–Button telephones, three COBOT Receptionist Auto Attendant units, and additionally moved and reinstalled the AT & T Spirit 1224 Key Telephone System, which included a Spirit control unit and expansion module that Intrend had used at its old location to its new Manteno facility.

This equipment, which essentially constituted the internal telecommunications system of Intrend, was subsequently connected to Intrend's incoming "800" WATS and outgoing LDMTS AT & T lines in late May of 1989 through Centrex lines or trunks provided by the Third–Party Defendant in this case, Illinois Bell (hereafter "Ameritech"), when Intrend contracted for or subscribed to Ameritech's Centrex Switching Service. Although the lines or trunks themselves were physically located on Defendant Intrend's premises, the switching or connection of calls from AT & T's outside lines to Intrend's internal phone system, and vice-versa, was performed through a combination of those lines or trunks located in Intrend's building and Centrex switching equipment located at Ameritech's Central Office.

Intrend's telecommunications system performed without incident until November of 1991, when Intrend found itself the victim of toll fraud. During the months of November and December of 1991, unknown third-parties discovered that they could phone into Intrend's facility per its "800" WATS lines, and then somehow manipulate Intrend's telecommunications system to obtain access to its outside AT & T long distance or LDMTS lines. These unknown "hackers" subsequently placed over $72,248.82 in long distance calls over Intrend's LDMTS lines and incurred over $16,273.73 worth of "800" WATS charges in accessing Intrend's long-distance lines, for a grand total of $88,522.25.

An employee of AT & T subsequently contacted Intrend in December of [1991], to alert Intrend to the unusual activity occurring on its "800" WATS and LDMTS lines. Although initially assured by AT & T employees that it would not be held liable for the unauthorized "800" WATS and LDMTS calls, Intrend was informed by AT & T in January of 1992 that it was Intrend's responsibility to secure its telecommunications system in order to prevent any unauthorized use of its AT & T lines. Intrend consequently immediately retained Telecommunications Specialist–Consultant Nina Wingard to investigate and stop the toll fraud problem, and additionally hired Telecommunications consultant Verlin Brown to confirm Ms. Wingard's findings.

After examining the telecommunications equipment housed at Intrend's Manteno facility, as well as the interaction of that equipment with the Centrex connecting service furnished by Ameritech, Ms. Wingard concluded and Mr. Brown confirmed that neither the AT & T Spirit Telephone System or the COBOT Receptionist Auto Attendants housed at Intrend's facilities were permitting the unauthorized "800" WATS caller to gain access to Intrend's AT & T LDMTS service. Rather, a multi-way calling feature of Ameritech's Centrex Switching Service, an option of which Intrend was not a subscriber, was

---

1. Judge Baker adopted Magistrate Judge Bernthal's recitation of facts in his Order dated 6/25/96. [Doc. # 64]. To date neither party has objected to the facts as set out in the Report and Recommendation. Accordingly, this Court too, adopts Magistrate Judge Bernthal's recitation of undisputed facts (citations omitted).

allowing the trunk-to-trunk transfer of the unauthorized caller's "800" call to Intrend's LDMTS service, with this "switch" apparently occurring through Centrex equipment located at Ameritech's Central Office. Ameritech subsequently restricted this multi-way calling feature of Intrend's Centrex Switching Service on January 28, 1992.

AT & T continued to bill Intrend for the prior unauthorized "800" WATS and LDMTS calls, but Intrend refused to pay these charges. AT & T subsequently brought suit against Intrend and Aamstrand on November 29, 1993, alleging that either Intrend individually or both Defendants jointly were liable for the unauthorized LDMTS and "800" WATS charges pursuant respectively to AT & T's Tariff Nos. 1 and 2 on file with the FCC.

On September 13, 1995, AT & T filed their motion for summary Judgment against Intrend and Aamstrand. [Doc. # 32]. On March 20, 1996, Magistrate Judge Bernthal issued his Report and Recommendation in which he granted AT & T's motion as to Intrend and denied the motion as to Aamstrand. [Doc. # 59]. Magistrate Judge Bernthal denied AT & T's motion as to Aamstrand because he found that a question of fact existed as to whether Aamstrand ever contracted with AT & T for "800" WATS and LDMTS services. (R & R at p. 8). However, Magistrate Judge Bernthal granted AT & T's motion as to Intrend because he found that Intrend was liable as a matter of law to AT & T pursuant to AT & T's Tariff No. 2 for unauthorized "800" WATS charges and that Intrend was also liable as a matter of law for the unauthorized LDMTS charges since no material question of fact existed as to whether the unauthorized LDMTS charges "originated" at Intrend's number pursuant to AT & T's Tariff No. 1. *Id.*

On June 25, 1996, District Judge Baker rejected the Report and Recommendation and denied AT & T's motion for summary judgment. [Doc. # 64]. Judge Baker denied AT & T's motion for summary judgment as to Aamstrand because he too found that there was a question of material fact as to whether Aamstrand contracted with AT & T for the WATS and LDMTS services. [Doc.

# 64 at p. 2 ¶ 4]. Judge Baker also denied AT & T's motion as to Intrend because he found that a material question of fact existed as to whether the fraudulent calls "originated" at Intrend's number. Specifically, Judge Baker stated:

Does Ameritech's failure to restrict the trunk-to-trunk access feature and the fact that Intrend did not contract with Ameritech for the feature that allowed the fraud remove Intrend's responsibility under the tariff if the calls did not "originate" with Intrend? Unlike the facts of *AT & T v. Jiffy Lube Int'l Inc.* [813 F.Supp. 1164 (D.Md.1993)], and *AT & T v. New York City Human Resources Admin.* [833 F.Supp. 962 (S.D.N.Y.1993)], [citations omitted], Ameritech provided Intrend with the Centrex system that permitted parties to call from outside the switching equipment on one trunk and be transferred to another trunk. This allowed outside parties to dial long distance numbers and have the calls charged to Intrend's number, all without Intrend's knowledge or permission. Taking into consideration the submissions by the parties at this point in the proceedings, these calls cannot be considered "Intrend's calls."

[Doc. # 64 at p. 2]. As a result of Judge Baker's ruling, AT & T filed the motion presently before the Court in which Plaintiff AT & T asks this Court to reconsider Judge Baker's Order denying AT & T's motion for summary judgment. [Docs. # 75–76].

## STANDARD OF REVIEW

■ "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale De Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir.1996) (quoting *Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982) aff'd, 736 F.2d 388 (7th Cir. 1984)). "Such motions cannot in any case be employed as a vehicle to introduce new evidence that could have been adduced during the pendency of the summary judgment motion." *Id.* (quoting *Keene Corp.*, 561 F.Supp. at 665). Disposition of a motion for reconsideration is left to the discretion of the district

court, and its ruling will not be reversed absent an abuse of that discretion. *Id.* at 1270 (*citing Billups v. Methodist Hosp.*, 922 F.2d 1300, 1305 (7th Cir.1991)).

### The Law of the Case

■ The summary judgment decision presently under reconsideration by this Court, became the-law-of-the-case when Judge Baker issued his Order on June 25, 1996, and generally such an order should be followed in all subsequent rulings. However, in a case where a federal judge is substituted or recuses himself during litigation, the second judge may alter the previous rulings of the first judge where the presiding judge finds that the law-of-the-case is erroneous. *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 562–63 (7th Cir.1982) (*citing* 1B Moore's Federal Practice P 0.404(1) at 407 (1982)).[2] "[W]hile a district judge should carefully consider the propriety of re-examining a prior ruling of another district judge in the same case, when good reasons for doing so appear (such as controlling law or clear error), the 'law of the case' doctrine must yield to rational decisionmaking." *Peterson v. Lindner*, 765 F.2d 698, 704 (7th Cir.1985).

In *Bowles v. Wilke*, the Seventh Circuit held that "the only restraint upon a second judge in passing upon [an] interlocutory issue decided by another judge in the same case is one of comity only, which in no way infringes upon the power of the second judge to act." *Bowles v. Wilke*, 175 F.2d 35, 37 (7th Cir.) *cert. denied*, 338 U.S. 861, 70 S.Ct. 104, 94 L.Ed. 528 (1949). The Seventh Circuit has gone on to state that " . . . we cannot be expected to reverse a correct decision by one district judge simply because we find it is

contrary to a prior ruling by another judge in the same case, i.e., contrary to the law of the case." *Champaign–Urbana News Agency, Inc. v. J.L. Cummins News Co. Inc.*, 632 F.2d 680, 683 (7th Cir.1980) (*quoting Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 797 (7th Cir.1961)).

Accordingly, when the law-of-the-case is wrong, the district court judge should take steps to correct those errors rather than await reversal by the Court of Appeals. *Id.* To modify the law-of-the-case is primarily a matter of "good sense" particularly when the modification is done early in the proceedings and when such a modification will serve to correct legal errors and accelerate the resolution of a dispute. *Id.* (*citing Uniformed Sanitation Men Association Inc. v. Commissioner of Sanitation of City of New York*, 426 F.2d 619, 628 (2d Cir.1970)), *motion denied*, 403 U.S. 917, 91 S.Ct. 2223, 29 L.Ed.2d 693 (1971), *cert. denied*, 406 U.S. 961, 92 S.Ct. 2055, 32 L.Ed.2d 349 (1972).[3]

■ For the reasons set out below, this Court finds that Judge Baker's Order denying AT & T's motion for summary judgment as to Intrend was *clearly erroneous.* As a result, this Court will modify the law-of-the-case to appropriately reflect the governing law as to a customer's liability to a telecommunications carrier in the event of toll fraud. However, since Magistrate Judge Bernthal [Doc. # 59 at p. 9–10], District Judge Baker [Doc. # 64 at p. 1–2], and this Court agree in the finding that a material question of fact remains as to whether Defendant Aamstrand contracted with AT & T for WATS and LDMTS services, AT & T's motion for summary judgment as against Aamstrand is DENIED.[4] Accordingly, the discussion below

**2.** Professor Moore explained:

> Since a lower court cannot by its law of the case bind a higher court having appellate jurisdiction over it, the only sensible thing for a lower federal court . . . to do is to set itself right instead of inviting reversal above, when convinced that its law of the case is substantially erroneous.

1B Moore's Federal Practice P 0.404(1) at 407 (1982).

**3.** *See also, Williams v. Commissioner of Internal Revenue*, 1 F.3d 502 (7th Cir.1993); *Johnson v. Burken*, 930 F.2d 1202 (7th Cir.1991); *Griffin v.*

*Dana Point Condominium Assoc.*, 768 F.Supp. 1299 (N.D.Ill.1991); *United States v. Desert Gold Mining Company*, 433 F.2d 713 (9th Cir.1970); *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131 (2d Cir.1956).

**4.** In finding that a material question of fact remained as to whether Aamstrand contracted with AT & T for WATS and LDMTS services Magistrate Judge Bernthal stated:

> According to the Defendant's Supplemental Answers to Plaintiff AT & T's Interrogatories, Defendant Aamstrand's Corporate name prior to 1994 was IT Trading Company, which con-

will only address AT & T's Summary Judgment Motion as it pertains to Defendant Intrend.

## DISCUSSION

### *Tariffs Under the Communications Act of 1934*

■ The Communications Act of 1934, as amended, requires common carriers, including long-distance telephone carriers, to file and maintain a schedule, or tariff, of contractual terms and conditions with the FCC. *See* 47 U.S.C. § 203(a)–(b) (1988); *see also MCI Telecommunications Corporation v. TCI Mail Inc.*, 772 F.Supp. 64 (D.R.I.1991) (*citing MCI Telecommunications Corp. v. FCC*, 765 F.2d 1186, 1188 (D.C.Cir.1985)). A tariff filed with the FCC must set forth the carrier's charges, classifications, practices, and regulations. 47 U.S.C. § 203(a) (1988). The contents of the tariff are subject to FCC regulation and approval. *Id.* § 203(b)(2). Under the "filed tariff doctrine," a tariff filed with the FCC supersedes all other agreements for interstate telephone service. *Id.* § 203(c); *Marco Supply Co. v. AT & T Communications, Inc.*, 875 F.2d 434, 436 (4th Cir.1989).

■ Tariffs filed with the FCC are not mere contracts, but rather have the force of law. *See Lowden v. Simonds–Shields–Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 614, 83 L.Ed. 953 (1939) ("Until changed, tariffs bind both carriers and shippers with the force of law."); *Carter v. American Telephone & Telegraph Co.*, 365 F.2d 486, 496 (5th Cir.1966) ("[A] tariff, required by law to be filed, is not a mere contract. It is the law."). Moreover, tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties. *American Telephone & Telegraph Co. v. Florida–Texas Freight, Inc.*, 357 F.Supp. 977, 979 (S.D.Fla.) aff'd, 485 F.2d 1390 (5th Cir.1973).

■ As a carrier providing interstate telecommunication service, AT & T must file tariffs with the FCC since they are governed by the provisions of the Communications Act, *American Telephone and Telegraph Co. v. New York Human Resources Administration*, 833 F.Supp. 962, 970 (S.D.N.Y.1993), and their customers are presumed to know the terms of the relevant tariffs. *Marco Supply Co. v. AT & T Communications, Inc.*, 875 F.2d 434, 436 (4th Cir.1989).

In accordance with the provisions of 47 U.S.C. § 203, AT & T filed with the FCC schedules of its rates and charges, together with all the rules, regulations and classifications used by AT & T in the conduct of its long distance telephone business. (Complaint at p. 3 ¶ 7). These schedules include Tariff F.C.C. No. 1 and Tariff F.C.C. No. 2. *Id.* AT & T's Tariff F.C.C. No. 1 delineates the payment obligations of a customer whose communication systems are connected to AT & T's Long Distance Telecommunication Service ("LDMTS"). Specifically, Tariff No. 1 provides:

**2.4 RESPONSIBILITIES OF THE CUSTOMER**

**2.4.1 General—The Customer's general responsibilities are described in this section.**

When Customer equipment or a Customer provided communication system is connected to *LDMTS*, the Customer assumes additional responsibilities that are described in the Connections section of this tariff (see Connections, page 30)

**A. Placement of Orders, Payment of Bills and Compliance with Regulations—**

The Customer is responsible for placing any necessary orders and complying with tariff regulations for LDMTS and for assuring that its Users comply with tariff regulations. The Customer is also responsible for the payment of bills for LDMTS.

stituted an inactive Illinois corporation during the time period at issue in this case.... This is the only information submitted by any of the parties in this case regarding the corporate status of Defendant Aamstrand during November 1991 through January 1992, when the unauthorized "800" WATS and LDMTS charges

incurred. Neither party has submitted any evidence which would clarify whether Defendant Aamstrand ... jointly contracted with Defendant Intrend for AT & T LDMTS and WATS services during the time period at issue in this case. (R & R at 9–10) (citations omitted).

This includes payment for LDMTS calls or services:

—*Originated at the Customer's number(s),*

—Accepted at the Customer's number(s) (e.g. Collect Calls),

—Billed to the Customer's number via Third Number Billing if the Customer is found to be responsible for such call or service, the use of Calling Card, or the use of a Company-assigned Special Billing Number, and

—Incurred at the specific request of the Customer....

Tariff F.C.C. No. 1, 2.4 (1990) (emphasis added).

AT & T's Tariff No. 2 delineates the payment obligations of a customer whose communication system is connected to AT & T's Wide Area Telecommunications Service ("WATS"). Specifically, Tariff No. 2 provides:

**2.4 RESPONSIBILITIES OF THE CUSTOMER**

**2.4.1. General—The Customer's general responsibilities are described in this section.**

When Customer Equipment or Customer-provided communications system is connected to *WATS,* the Customer assumes additional responsibilities that are described in the Connections section of this tariff (see Connections, page 36).

**A. Placement of Orders, Payment of Bills and Compliance with Regulations—**

The Customer is responsible for placing all orders and complying with tariff regulations for WATS and for assuring that its Users comply with tariff regulations. *The Customer is also responsible for the payment of bills for WATS....*

Tariff F.C.C. No. 2, 2.4 (1990) (emphasis added).

**A. *AT & T Tariff F.C.C. No. 1 (LDMTS).***

Pursuant to Tariff No. 1, a customer is obligated to pay for long-distance charges if the calls "originate at the Customer's number(s)." Accordingly, Intrend maintains that they are not liable for the fraudulent LDMTS calls because those calls did not "originate at" Intrend's number. (*See* Defendant and Third–Party Plaintiffs' Objection to Report and Recommendation on Motion of Plaintiff AT & T for Summary Judgment at p. 4–5). Intrend maintains that a calling feature of Ameritech's Centrex Switching Service allowed unauthorized callers to be transferred from Intrend's "800" WATS line to an outgoing AT & T LDMTS line with the "switch" actually occurring through Centrex equipment located at Ameritech's Central Office. *Id.* Therefore, Intrend argues that if the calls "originated" anywhere, they "originated at" Ameritech—not with or at Intrend's number. *Id.* Judge Baker agreed with Intrend to the extent that he found that there was a material question of fact as to whether the LDMTS calls originated at Intrend's number. [Doc. # 64 at p. 2].

Intrend also attempts to factually distinguish this case from other FCC and federal court cases which have assigned toll fraud liability to the customer. [Memorandum of Law in Support of Motion to Deny AT & T's Motion for Summary Judgment at p. 9–10]. Intrend argues that the past toll fraud cases obligating the customer to pay have all considered customers who utilized PBX[5] and remote access systems. *Id.* at 10. Accordingly, Intrend maintains that those cases have no precedential value here since Intrend did not use a PBX nor did they employ a remote access device. *Id.*

The FCC has assigned toll fraud liability to the customer in cases similar to the instant action. In determining customer liability and in making the "origination" determination pursuant to AT & T Tariff No. 1, the FCC has not, as Intrend would argue, distinguished between a private branch exchange

---

**5.** "A PBX is a customer-provided private switching system used to facilitate the transmission of telephone calls to, from, and within a place of business. It is equipment added to the public telephone network by a customer[], the use of

which requires neither the knowledge nor approval of AT & T." *American Telephone and Telegraph Co. v. Jiffy Lube International, Inc.,* 813 F.Supp. 1164, 1165 n. 1 (D.Md.1993).

(PBX) personally added and maintained by the customer and a switching system added by a third party at the direction of the customer, e.g., a Centrex System. Rather, the FCC has focussed on whether the customer could have controlled and/or prevented the fraudulent use of their telecommunications system.

In *Chartways Technologies Inc. v. AT & T Communications,* the Common Carrier Bureau of the FCC held Chartways Technologies Inc. ("Chartways") liable for all LDMTS calls made from their phone system, including those made by unauthorized callers through a PBX remote access feature. 6 F.C.C.R. 2952, 1991 WL 640363 (1991). Later, the Commission affirmed the Common Carrier Bureau and found that AT & T's Tariff No. 1 required payment by Chartways of long distance charges associated with unauthorized calls placed through Chartways' PBX. *See Chartways Technologies Inc. v. AT & T Communications,* 8 F.C.C.R. 5601, 1993 WL 757197 (1993). The Commission determined that the customer should bear the burden of the fraudulent call expense since the customer "had the actual ability to prevent such calls ..." 1993 WL 757197 at *6 (1993).

Most recently, in *Directel Inc. v. American Tel. & Tel. Co.,* the Common Carrier Bureau found that unauthorized calls that are made through a customer's PBX originate at the customer's number. 11 F.C.C.R. 7554, 1996 WL 350607, *6 (June 26, 1996). Once again the Bureau noted, citing *Chartways Technologies Inc.,* that in the absence of any evidence that the customer lacked the ability to control fraudulent calling, AT & T's Tariff No. 1 properly places responsibility for fraudulent calls on the customer. *Id.*

█ These FCC decisions which assign toll fraud liability to the customer are particularly significant here since this Court must accord great deference to the determinations made by the FCC. *See FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...").

Moreover, the federal courts, which have considered the identical issues raised by the instant action, also assign liability for fraudulent LDMTS charges to the customer pursuant to AT & T Tariff No. 1. *See American Tel. & Tel. Co. v. Jiffy Lube Int'l., Inc.,* 813 F.Supp. 1164 (D.Md.1993); *American Tel. & Tel. Co., v. New York Human Resources Administration,* 833 F.Supp. 962 (S.D.N.Y. 1993); *AT & T Corp., v. Community Health Group,* 931 F.Supp. 719 (S.D.Cal.1995).

In *AT & T v. Jiffy Lube Int'l. Inc.,* Jiffy Lube International Inc. ("Jiffy Lube") utilized a telephone system that included a remote access feature by which an off-premises caller could dial an 800 number (provided by MCI Telecommunications, Inc.), access Jiffy Lube's PBX, and upon entering a special code devised by Jiffy Lube, obtain a dial tone. 813 F.Supp. at 1165. Eventually, unauthorized callers gained access to Jiffy Lube's long-distance (LDMTS) line through the remote access feature and, upon breaking the special code, placed approximately $55,-727.39 of unauthorized calls. *Id.* Subsequently, Jiffy Lube refused to pay for the unauthorized long-distance (LDMTS) calls and AT & T filed suit. *Id.* AT & T argued that Jiffy Lube was required to pay for the unauthorized calls under AT & T F.C.C. Tariff No. 1 since, as AT & T maintained, the calls "originated" at Jiffy Lube's number. *Id.* Conversely, Jiffy Lube maintained that they were not responsible for payment because the calls originated at the fraudulent caller's number. *Id.* at 1166. In granting summary judgment for AT & T the court stated:

> In arguing that the unauthorized calls originated not at Jiffy Lube's number, but at the unauthorized caller's number, Jiffy Lube ignores the fact that it created the vehicle and mechanism by which those long distance calls became possible. But for Jiffy Lube's installation of a telephone system with a remote access feature, the disputed calls could not have been made. [citations omitted]. Accordingly, this Court holds, ... that the word "originated" as used in the Tariff is unambiguous, and that the Tariff unambiguously places responsibility for calls, [ ] whether or not

authorized, squarely upon a customer such as Jiffy Lube.

In *AT & T v. New York City Human Resources Admin.*, New York City (the "City") purchased a private branch exchange (PBX) from Northern Telecom. 833 F.Supp. at 968. The PBX served to connect the city's internal telephone extensions and to connect the city's telephone system to outgoing AT & T long-distance lines (LDMTS). *Id.* Eventually one of the city's employees manipulated the PBX so as to allow any off-premise caller who was aware of the manipulated PBX to fraudulently place long-distance calls. *Id.* Consequently, the City received a bill in the amount of $529,000 for unauthorized calls. *Id.*

Here again, AT & T filed suit to recover the $529,000 of unauthorized long-distance charges and the City argued, just as in *Jiffy Lube Int'l Inc.*, that they were not obligated to pay for the fraudulent calls pursuant to AT & T Tariff No. 1 because the calls "originated" at the handset where the unauthorized off-premise callers placed the long-distance calls. *Id.* at 971. The court held that the plain meaning of the Tariff required the conclusion that the remote unauthorized calls placed through the City's PBX—"originated at"—the City's PBX. *Id.* The court noted that adopting the City's interpretation of the Tariff would lead to a nonsensical result in the case where an *authorized* off-premise caller accessed the City's PBX and placed a long-distance call since such a caller could escape paying for their long-distance calls by arguing that their call did not originate at the City's PBX. *Id.* at 973.

In *AT & T v. Community Health Group*, AT & T filed a complaint to recover over $80,000 of long-distance telephone charges placed by a computer "hacker" who illegally gained access to the Defendants' phone system. 931 F.Supp. at 721. In this case, the Defendants had entered a lease agreement with Centrex Equipment Associates and Pacific Bell in which Centrex and Pacific Bell leased, installed, configured, and maintained an "automated attendant" and phone lines attached to the Defendants' PBX system. *Id.* at 723.

Again, the Defendants argued, *inter alia*, that they were not obligated to pay the long-distance telephone charges because the calls did not "originate" at the Defendants' number and since the Defendants were unaware of the fraudulent activity. *Id.* The court held that a customer is liable for all long-distance calls made from its on-premises PBX, regardless of whether such calls were authorized or fraudulent. *Id.* The court went on to find that the presence of a remote access mechanism, including an off-premises computer, does not affect the "origination" determination; calls still originate from a customer's PBX system even if access to the PBX was gained from a remote location. *Id.* (*citing American Tel. & Tel. Co. v. Jiffy Lube Int'l. Inc.*, 813 F.Supp. 1164, 1167 (D.Md.1993)). The court found that this rule applies even if the customer's on premises PBX system did not originally include a remote access feature, and the PBX is manipulated by outside parties from remote locations. *Id.* at 723–24 (*citing American Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F.Supp. 962, 973 (S.D.N.Y. 1993)).

In the instant action, Intrend hired Nitec to advise, design, purchase, and install a telecommunications system. Later, Intrend contracted with AT & T for WATS and LDMTS services. Intrend also subscribed to Ameritech's Switching Service. (See Centrex Switching Service Customer Acceptance Agreement, Plaintiff's Appendix Supp.Motion for Summary Judgment at Tab 19, see also R & R at p. 3 n. 1). Although the telephone lines themselves were physically located on Intrend's premises, the switching or connection of calls from AT & T's outside lines to Intrend's internal phone system was performed through a combination of those lines located in Intrend's building and Centrex switching equipment located at Ameritech's Central Office. Accordingly, Intrend maintains that the fraudulent calls in dispute did not originate at Intrend but rather at Ameritech.

As Intrend argues that the fraudulent calls did not originate at their number, Intrend ignores the fact that it created the vehicle and mechanism, with the help of Nitec, by which the fraudulent LDMTS calls were

made. *See AT & T v. Jiffy Lube Int'l Inc.,* 813 F.Supp. 1164, 1166 (D.Md.1993). "But for" Intrend's choice of Ameritech as their switching service, the fraudulent calls may not have been possible. *See Id.*

Accordingly, as Magistrate Judge Bernthal correctly found, Intrend was in the best position to detect and prevent the fraudulent use of its telecommunications system since it was Intrend and *not* AT & T who had put the overall telecommunications system in place. (R & R at 21–22). Therefore, the fraudulent calls in this case originated at the number of the telecommunications system that Intrend created. Thus, Intrend is obligated to pay for the fraudulent charges pursuant to AT & T Tariff No. 1, even though the connection may have physically occurred at Ameritech's Central Office rather than on the premises of Intrend. *See AT & T Corp. v. Community Health Group,* 931 F.Supp. 719, 723 (S.D.Cal. 1995) (access through an off-premises computer does not affect the "origination" determination.).

Furthermore, if this court were to accept Intrend's argument that the fraudulent calls originated at Ameritech's Central Office pursuant to Tariff No. 1, this would lead to the same nonsensical result described in *AT & T v. New York City Human Resources Administration,* 833 F.Supp. 962, 973 (S.D.N.Y. 1993). That is, any business could circumvent AT & T's Tariff by arguing that none of their LDMTS calls could possibly originate at their number since they subscribe to an off-site switching service. Accordingly, if this Court were to accept Intrend's construction of the term originate, then any business using an off-site switching service could challenge all of their long-distance charges whether those charges were authorized or not. This Court finds that such a construction of the term "originate" is erroneous.

 In addition, on January 28, 1992, Ameritech restricted the multi-way calling feature that allowed the fraudulent calls to occur. As a result, no further toll fraud problems were experienced. Intrend does not dispute that they could have requested Ameritech to restrict the multi-way feature at anytime, rather Intrend maintains that they had no reason to make such a request

because (1) they did not know that the feature was enabled and (2) they did not know fraudulent calls were being placed. However, Intrend's lack of knowledge as to both counts does not allow Intrend to escape their LDMTS payment obligations. *See AT & T Corp. v. Community Health Group,* 931 F.Supp. 719, 723 (S.D.Cal.1995). Rather, Intrend must demonstrate that they "lacked the ability to control" the mechanism by which the unauthorized calls were being placed. *See Directel Inc. v. American Tel. & Tel. Co.,* 11 F.C.C.R. 7554, 1996 WL 350607, at *6 (1996). Since Intrend could have taken steps to prevent unauthorized calling and did not, Intrend as the customer should bear the burden of paying for the unauthorized calls. *See Chartways Technologies Inc. v. AT & T Communications,* 8 F.C.C.R. 5601, 1993 WL 757197, at *6 (1993).

Finally, Intrend's attempts to factually distinguish the aforementioned cases are unpersuasive since *AT & T v. Community Health Group* considered a telecommunications system that employed a Centrex device like Intrend's and since Intrend's toll fraud liability exists whether they knowingly subscribed to a remote access feature or not. *See AT & T v. Community Health Group,* 931 F.Supp. at 723–24 (*citing AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962, 973 (S.D.N.Y.1993)).

Therefore, since the fraudulent calls originated at Intrend's number, Intrend is liable for the cost of those calls pursuant to AT & T Tariff No. 1 as a matter of law. Accordingly, this court finds that Judge Baker's Order dated June 25, 1996 [Doc. # 64] was clearly erroneous and therefore GRANTS AT & T's Motion for Summary Judgment as to Defendant Intrend for the disputed LDMTS charges.

**B. *AT & T Tariff F.C.C. No. 2 (WATS).***

 Now the Court must turn to Intrend's payment obligations under Tariff No. 2. As described above, throughout Intrend's Pleadings they argue, citing AT & T's Tariff No. 1, that they are not obligated to pay AT & T for the fraudulent calls made on their telecommunications system because those

calls did not "originate" at their number. However, Intrend confuses the payment obligations under Tariffs No. 1 and 2. Unfortunately, Judge Baker similarly confused the payment obligations under the respective tariffs by focussing on the term "originated." [6]

Magistrate Judge Bernthal correctly distinguished in his Report and Recommendation the fact that Tariff No. 1 governs AT & T's long-distance services (LDMTS), and Tariff No. 2 governs AT & T's 800 Services (WATS). (R & R at p. 12). Accordingly, Judge Baker's concern as to where the fraudulent calls "originated" was misplaced as to the $16,273.73 of WATS charges.

 Indeed, in *Chartways Technologies v. AT & T Communications*, the Federal Communications Commission found that the point at which fraudulent calls "originate" has no bearing on a customer's payment obligation for WATS. 8 F.C.C.R. 5601, 1993 WL 757197, *5 (1993). The Commission stated:

> For 800 Service, there is no requirement under the relevant tariff provision that a call *originate* at the customer's number before the customer can be liable for the charges, because 800 Service calls always terminate at the customer's number. Moreover, because 800 Service, by its very nature, is designed to allow callers unknown to the customer to use the service, the customer has, by subscribing to the service, *implicitly authorized* any call utilizing the service.

6. Judge Baker framed the entire summary judgment issue as to Intrend in terms of where the fraudulent calls *originated*. Judge Baker asked: "Does Ameritech's failure to restrict the trunk-to-trunk access feature and the fact that Intrend did not contract with Ameritech for the feature that allowed the fraud remove Intrend's responsibility *under the tariff* if the calls did not *"originate"* with Intrend?" [Doc. # 64 at p. 2] (emphasis added).

7. This Court notes that the FCC is reviewing information in connection with potential rulemaking on the complicated issue of liability and toll fraud. *See e.g., In The Matter of Policies and Rules Concerning Toll Fraud,* 8 F.C.C.R. 8618, 1993 WL 596930 (November 10, 1993); *Florida Public Service Commission Petition for Review of*

*Id.* (emphasis added). In light of the FCC's role in enforcing the provisions of the tariff, this Court must accord great deference to the FCC's determination described above. *See FCC v. WNCN Listeners Guild,* 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . .").[7]

Therefore, since the FCC has determined that a customer implicitly authorizes all WATS calls and since Tariff No. 2 does not require that a call "originate" at the customer's number, Judge Baker's finding that a material question of fact remained as to where the fraudulent *WATS* calls originated was erroneous. Accordingly, this Court rejects Judge Baker's decision and finds as a matter of law that Intrend is liable under AT & T Tariff No. 2 for the WATS charges.

### *Unreasonable Charges Pursuant to AT & T's Tariffs*

 Intrend argues that AT & T's Tariff should be declared invalid because it unreasonably places payment responsibility upon telecommunications customers for fraudulent unauthorized calls. (Defendant and Third–Party Plaintiffs' Objection to Report and Recommendation on Motion of Plaintiff AT & T for Summary Judgment at p. 6). In short, Intrend maintains that the practice of charging an innocent customer like Intrend with the cost of fraudulent toll calls wrongfully ascribed to their account is unreasonable in violation of Illinois law which requires that a utility's rules and regulations pertaining to

*Tariff Provisions Relating to Liability for Toll Fraud Charges,* 8 F.C.C.R. 2562 (April 5, 1993); *Policies and Rules Concerning Operator Service Access and Pay Telephone Compensation, Order on Further Reconsideration and Further Notice of Proposed Rulemaking,* 8 F.C.C.R. 2863 (April 9, 1993). The fact that the FCC has conducted such a review suggests that the FCC may alter the governing law as to customer liability and toll fraud. However, because such rules would not have been in force at the time the disputed calls were made, and can only apply prospectively, they are irrelevant to the analysis here. *See AT & T Co. v. FCC,* 978 F.2d 727, 732 (D.C.Cir. 1992) *cert. denied* 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993).

charges must be reasonable. *Id. citing* 220 ILCS 5/9–101.

The FCC has already indicated its view that a carrier's attempt to collect unauthorized charges in a toll fraud case is not unreasonable if consistent with the terms of its tariff. *MCI Telecommunications v. Ameri–Tel Inc.,* 852 F.Supp. 659, 664 (N.D.Ill. 1994) (*citing Chartways Technologies Inc. v. AT & T Communications,* 8 F.C.C.R. 5601, 1993 WL 757197 (1993)). Moreover, this Court does not believe holding a telecommunications customer liable for WATS and LDMTS services under the terms of Tariff No. 1 and 2 is unreasonable particularly since the customer in this case was in the best position to prevent the unauthorized calls. Consequently, this Court will not entertain Intrend's state law argument further.

### CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff AT & T's Motion for Reconsideration [Doc. # 75] is **GRANTED.**

IT IS FURTHER ORDERED that Judge Baker's Order [Doc. # 64] dated June 25, 1996, is **VACATED,** and Magistrate Judge Bernthal's Report and Recommendation [Doc. # 59] dated March 20, 1996, is **ADOPTED.**

IT IS FURTHER ORDERED that Plaintiff AT & T's Motion for Summary Judgment [Doc. # 32] is **GRANTED** in its entirety as to Defendant Intrend and **DENIED** as to Defendant Aamstrand.

IT IS FURTHER ORDERED that Plaintiff AT & T's Request for Interlocutory Appeal Certification [Doc. # 75] is **DENIED** as it is moot. This case is referred to Magistrate Judge Bernthal for further proceedings.